(No. 72292.—

RICHARD GOLDBERG, M.D., Appellant, v. JUDITH DAVIS, M.D., Appellee.

*Opinion filed October 15, 1992.*

Sandra G. Nye & Associates, of Chicago, and Randy Wayne Franklin, of Park Ridge, for appellant.

Daniel J. Pope and Helen K. Whatley, of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee.

JUSTICE CUNNINGHAM delivered the opinion of the court:

Plaintiff, Dr. Richard Goldberg, M.D., appeals from the judgment of the appellate court which reversed the order of the circuit court of Cook County. (215 Ill. App. 3d 930.) The defendant, Judith Davis, M.D., filed an interlocutory appeal after the circuit court ordered defend-

ant to produce, for *in camera* inspection, certain records of the psychiatric history of C.B., the complaining witness, for use in a license disciplinary proceeding against the plaintiff before the Illinois Department of Professional Regulation (Department). This court granted plaintiff's petition for leave to appeal pursuant to Supreme Court Rule 315 (134 Ill. 2d R. 315). We reverse.

The facts are as follow. On July 25, 1988, the Department filed a complaint with the medical disciplinary board against Dr. Richard Goldberg, a psychiatrist, alleging that during his course of treatment of C.B. he engaged in improper treatment as follows:

"a. [Dr. Goldberg] purchased dinner for [C.B.] and spoon-fed her during a therapy session in his office;

b. [Dr. Goldberg] went to [C.B.'s] home during the evening hours where he spoon-fed her ice-cream and observed her vomiting;

c. [Dr. Goldberg] picked up [C.B.] at her home during the evening hours of October 22, 1987, drove her to Lincoln Park in Chicago, parked his car and kissed and fondled [C.B.];

d. [Dr. Goldberg], on October 23, 1987, took [C.B.] to an apartment the Respondent kept in the same building his office was located, at which time and place the Respondent and [C.B.] mutually participated in acts of oral sex and attempted to have sexual intercourse."

The Department sought revocation of, suspension of, or other appropriate action against plaintiff's certificate of registration. At the administrative hearing of December 5, 1988, only four witnesses testified: C.B., Dr. Goldberg, Dr. Davis, C.B.'s treating physician at that time, and Judith Johnson, an investigator for the Department. During the hearing, plaintiff sought certain records from defendant. Subsequently, the hearing officer stopped the hearing until resolution of this issue.

Dr. Goldberg testified that he has been licensed to practice medicine as a physician and surgeon in the

State of Illinois since 1978. His specialty is psychiatry, and his practice is in general psychiatry, which includes the treatment of adults and adolescents. Dr. Goldberg also has a subspecialty in chemical dependency and a specialty in dual diagnosis treatment. He explained dual diagnosis as treatment involving "individuals who have both chemical dependency or substance abuse problems as well as various kinds of emotional disorders and perhaps formal psychiatric disorders." In his practice, he attends to the medical needs of his patients who are in the hospital. Although his entire practice is private practice, he has had a paid clinical appointment at River Edge Hospital since November 1987.

In June 1987, C.B. was referred to Dr. Goldberg. Dr. Goldberg's original diagnosis of C.B. was "Bulimia; rule out dysthymic disorder." Dr. Goldberg also diagnosed her as having severe character pathology, *i.e.*, borderline personality. She had depressive reactions and a number of "intercurrent life crises that developed" as a result, so he did not primarily treat only one problem.

He stated that, in short, bulimia is an eating disorder characterized by eating large amounts of food at one sitting at least two times a week, a loss of control over eating behavior and a purging behavior as well as gross misperception of shape or size of one's body. Dysthymic disorder is an affective disorder which largely constitutes depression. It is a lesser form of depressive illness formerly referred to as depressive neurosis and is a reactive type of depressive disorder.

He ruled out dysthymic disorder because it did not add anything to his thinking. He stated that since C.B. already had reactive depressive periods from her borderline personality, an additional diagnosis of dsythymic disorder would have been redundant.

During the 50 times he saw C.B., he used individual psychotherapy which required conversations between

him and C.B. Although the focus of his treatment was not in regard to bulimia, a majority of the appointments concerned her eating disorder. Especially in the early phase of treatment, his primary focus of the treatment was her well-being because he wanted to get a sense of where the core issues were and where the primary problem was.

During this period of C.B.'s treatment, Dr. Goldberg's office was located at 505 North Lake Shore Drive, suite 2317, a converted studio apartment. From June to October 1987, Dr. Goldberg also maintained another suite, suite 1814, in the same building. He saw C.B., as well as other patients, at suite 2317. He also saw patients at suite 1814, but not on a regular basis. He usually saw patients in suite 1814, especially if the treatment was psychotherapy. He would use suite 1814 for family, couple or group psychotherapy because suite 2317 was not suited for psychotherapy.

During the course of treatment of C.B., Dr. Goldberg never saw C.B. eat, more specifically, yogurt, in suite 2317. He, however, observed her eat yogurt at her apartment. He stated that it was important for him to observe her eat during the course of treatment. Although he did not see her binge and purge, he did see her eat and vomit at her apartment.

On October 16, around 6 p.m., Dr. Goldberg went to her apartment because she was not doing very well. C.B. conveyed to him more than an eating disorder, but some sort of emotional strife or mindset that she gets into when she is eating. She stated that she goes into an eating frenzy. She kept telling him that neither he nor anyone else would understand. Dr. Goldberg knew that she had been through many treatments before with many famous experts across the country. At this point, Dr. Goldberg believed his therapy was going to fail unless he could observe her eat in order to develop some knowl-

edge and empathy. On October 16, he observed her eat a quantity of ice cream, some "chips" and some maple syrup. He did not spoon-feed her. He later observed her vomit. Dr. Goldberg has had other patients with similar diagnoses, but did not go to their apartments in the course of treatment to observe these patients purge.

Dr. Goldberg had an occasion to see C.B. in his car. It was approximately 8:30 or 9:30 p.m. when C.B. and Dr. Goldberg drove around north into the area of Lincoln Park and stopped the car. They stayed at that location for half an hour to 45 minutes. He eventually drove her home. He denied kissing or fondling her in any sexual fashion.

Dr. Goldberg held his appointments with C.B. at suite 2317. However, on October 23, they went to suite 1814 because she was nauseated and might need to use the bathroom. He denied having oral sex with her in suite 1814. Dr. Goldberg read in full the progress notes for October 23. In those notes, he stated that C.B. tried to initiate a sexual encounter. When he refused her advances, she yelled at him and left.

Dr. Judith Davis testified next at the administrative hearing. Dr. Davis has been licensed to practice medicine in Illinois for 14 years, and has practiced in the Chicago area during those 14 years. When she completed her residency in psychiatry at Johns Hopkins, she opened her practice, specializing in psychoanalysis or psychiatry. She stated she was not paid for her testimony at the hearing. Dr. Davis stated that she was familiar with the standards of professional behavior of psychiatrists in the Chicago area between 1987 and 1988, as well as with the standards of responsibility that a psychiatrist has towards a patient. She is also familiar with the standards for the conduct of psychiatrists with patients in the Chicago area during 1987 through 1988.

Dr. Davis stated that, in her opinion, the fact that a psychiatrist enters into a sexual relationship with a patient is very destructive to the treatment. The patient finds it harder to trust any subsequent therapist. She was also of the opinion that going to a patient's home in a nonemergency situation violates those standards. She was also of the opinion that a psychiatrist violates those standards when he picks up a patient in his car in the evening hours, goes for a ride and parks for some conversation.

Dr. Davis became familiar with C.B. during the past year because she has been treating C.B. for psychiatric problems. Dr. Davis diagnosed C.B. as having dysthymic disorder, bulimia and trauma. The trauma related to the alleged episode with Dr. Goldberg.

Dr. Davis is familiar with the treatment of bulimia. The treatment does not require the patient to eat and regurgitate in the therapist's presence. During her treatment of C.B., Dr. Davis did not find it necessary to watch her eat and purge.

Under cross-examination, Dr. Davis stated that the only information she had about the treatment of C.B. by Dr. Goldberg was given by C.B. She is also familiar with C.B.'s psychiatric background other than her treatment with Dr. Goldberg.

Dr. Davis stated that C.B. was dysthymic with a mild borderline personality disorder and bulimia. She diagnosed C.B. with borderline personality because of the intensity of her feelings, *i.e.*, her depression and, at times, her anger. Most of the feelings are a result of dysthymia, *i.e.*, the depression and suicidal feelings from time to time. Dr. Davis stated that C.B. is not primarily borderline, but rather has a very mild borderline personality disorder.

Dr. Davis stated that C.B. "fell in love" with Dr. Goldberg and became very disappointed. Dr. Davis' un-

derstanding is that C.B.'s feelings were based on reality and that sexual actions did occur. She agreed that an erotic transference did form from C.B. to Dr. Goldberg. However, it was a response to reality. Dr. Davis is aware that Dr. Goldberg at one point wanted to stop, but C.B. did not. Dr. Davis is aware that C.B. felt rage and depression after the relationship ended.

Judy Johnson, an investigator with the Department, testified at the hearing to the procedures used in the investigation of this matter.

C.B. testified next at the hearing. C.B., a 30-year-old woman, met Dr. Goldberg in June 1987 for psychiatric problems. Prior to Dr. Goldberg, she had seen other psychiatrists for 12 years. She came to Dr. Goldberg with complaints of depression, suicidal thoughts and bulimia. Dr. Goldberg had not conducted a physical examination during the course of treatment. Dr. Goldberg had not requested a release for her medical records from previous psychiatrists and medical institutions.

C.B. stated that her relationship with Dr. Goldberg became intimate quickly. She would ask for hugs and he would hug her before she left the office. At the beginning of the treatment, she saw the doctor twice a week. Later, she saw the doctor three times a week. During the course of treatment, they both bought food at a deli in the office building and ate it in Dr. Goldberg's office. Dr. Goldberg even spoon-fed her some of the yogurt she had purchased. On another occasion, Dr. Goldberg gave her a cookie to eat in the office. During the course of her treatment, she even met with the doctor at her apartment. She wanted him to see how difficult it was to control her bulimia after she came home from work. She asked him to come to her apartment for the next session. Prior to the session at the apartment, she told him that she was attracted to him and that it was frustrating. She was still attracted to him when he came to her

apartment. At the apartment, Dr. Goldberg watched her binge and purge for approximately 20 to 30 minutes. Dr. Goldberg even spoon-fed her.

After the session at C.B.'s apartment, she saw Dr. Goldberg about a week later at a therapy session. She told him that she needed to go for a consultation because she did not believe things were going right in treatment. She also told him that she was too attached to him and too attracted to him to make any progress. She told him that she was going to see Dr. George Pollack. On the same day she saw Dr. Pollack, she talked to Dr. Goldberg on the phone. She next saw Dr. Goldberg in person in front of her apartment. Dr. Goldberg had parked his car in front of her apartment building. She then entered his car and took a ride to Lincoln Park. They eventually stopped the car in the park. Dr. Goldberg told her that he could help her. However, she told him that she could not see how because she was so attracted to him and he was attracted to her. They eventually kissed. They then discussed where to meet next to have sex. Dr. Goldberg suggested his other office on the 18th floor. On the following day, she went to his office on the 23d floor and they went to his office on the 18th floor. They had oral sex and attempted intercourse.

At the end of the Department's case, the attorney for Dr. Goldberg requested the medical records from Menninger's, a hospital at which C.B. was treated prior to her treatment with Dr. Goldberg. The Department objected because in June 1987, Dr. Goldberg did not find the records important enough to request them and, as such, those records are not important now. However, Dr. Goldberg's attorney argued that the records were important to the issue of C.B.'s credibility. The hearing officer directed the moving party to make a written request. Until such written request, the hearing officer did not compel production. The hearing was continued.

On February 15, 1989, a hearing was held regarding Dr. Goldberg's attorney's efforts to compel production of prior medical records. The hearing officer postponed the hearing 60 days in order that Dr. Goldberg might seek production of the medical records in the circuit court.

On March 27, 1989, attorneys for Dr. Goldberg filed an action to compel production of relevant papers in administrative proceedings in the circuit court of Cook County. On May 1, 1989, the Department filed a motion to dismiss.

At the hearing of June 29, 1989, before the medical disciplinary board hearing officer, the attorneys for Dr. Goldberg stated that he had filed a petition in the chancery division seeking an order to compel production of relevant papers in the administrative proceeding (subpoena *duces tecum*) from Dr. Davis. On July 13, 1989, the circuit court dismissed the Department from plaintiff's circuit court action.

On October 13, 1989, the hearing officer held a hearing on the motion to quash the subpoena *duces tecum*. The hearing officer stated that he had at least authority to have the medical records produced for an *in camera* inspection in order to determine relevance. However, he did not believe that he had authority under section 10(a)(1) of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1987, ch. 91½, par. 810(a)(1)) to make such an order. He stated that the only body to have such authority was the circuit court. He eventually put the subpoena on hold because he found that there was a waiver, but instructed the Department to go to the circuit court if the Department did not want the records admitted. The hearing officer continued the case for a full evidentiary hearing.

On January 9, 1990, the circuit court entered an order compelling Dr. Davis to produce the records for an *in camera* inspection to determine relevancy by Febru-

ary 7, 1990. However, on February 6, 1990, defendant filed this interlocutory appeal. The appellate court reversed the order of the circuit court. This court granted leave to appeal.

Although the parties raise several issues, this court finds that this case rests on whether the circuit court abused its discretion when it ordered the defendant to produce all medical records for an *in camera* inspection. The answer to this issue lies within the statutory framework of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (the Act) (Ill. Rev. Stat. 1987, ch. 91½, par. 801 *et seq.*).

This court notes that although both parties cite numerous cases in support of their arguments, we do not find that these cases assist in the resolution of this matter. None of the cases involved the issue before this court. Further, decisions of the appellate court are not binding on this court. Thus, the case at bar can only be resolved by review of its unique facts.

Although section 3 of the Act provides that "[a]ll records and communications shall be confidential and shall not be disclosed *except as provided in this Act*" (emphasis added) (Ill. Rev. Stat. 1987, ch. 91½, par. 803(a)), the remaining provisions of the Act recognize that the privilege is not absolute. Section 5 of the Act sets out who may give written consent to release those records if the patient does not. (Ill. Rev. Stat. 1987, ch. 91½, par. 805.) Section 5 also provides that there are exceptions whereby written consent is not necessary, as provided in sections 6 through 12.2 of the Act. (Ill. Rev. Stat. 1987, ch. 91½, pars. 805 through 812.2.) It is section 10 that provides for unconsented disclosure in administrative proceedings. Ill. Rev. Stat. 1987, ch. 91½, par. 810.

Section 10(a)(1) provides the criteria for determining whether disclosure is proper. Section 10(a)(1) provides in part:

"§10. (a) Except as provided herein, in any civil, criminal, administrative, or legislative proceeding, or in any proceeding preliminary thereto, a recipient [patient], and a therapist on behalf and in the interest of a recipient [patient], has the privilege to refuse to disclose and to prevent the disclosure of the recipient's [patient's] record or communications.

(1) Records and communications may be disclosed in a civil, criminal or administrative proceeding in which the recipient [patient] introduces his mental condition or any aspect of his services received for such condition as an element of his claim or defense, if and only to the extent the court in which the proceedings have been brought, or, in the case of an administrative proceeding, the court to which an appeal or other action for review of an administrative determination may be taken, finds, after in camera examination of testimony or other evidence, that it is relevant, probative, not unduly prejudicial or inflammatory, and otherwise clearly admissible; that other satisfactory evidence is demonstrably unsatisfactory as evidence of the facts sought to be established by such evidence; and that disclosure is more important to the interests of substantial justice than protection from injury to the therapist-recipient [patient] relationship or to the recipient [patient] or other whom disclosure is likely to harm." Ill. Rev. Stat. 1987, ch. 91½, par. 810(a)(1).

The first criteria to be examined in section 10(a)(1) is whether C.B. has introduced her mental condition or any aspect of the services received for such condition as an element of her claim. In this case, the court finds that C.B. has introduced her mental condition as well as services received as part of the Department's complaint. In the testimony offered at the hearing, Dr. Goldberg stated that he diagnosed C.B. as having bulimia and a severe borderline personality. On the other hand, Dr. Davis diagnosed C.B. as having bulimia and dysthymic disorder, *i.e.*, depression, and only a mild form of borderline personality disorder. Although both doctors have

diagnosed C.B. with the same illness, the real difference involves the diagnosis of borderline personality. That diagnosis is significant to the issue of whether any sexual misconduct occurred.

The diagnostic criteria for a borderline personality disorder is:

"(1) impulsivity or unpredictability in at least two areas that are potentially self-damaging, e.g., spending, sex, gambling, substance abuse, shoplifting, overeating, physically self-damaging acts;

(2) a pattern of unstable and intense interpersonal relationships, e.g., marked shifts of attitude, idealization, devaluation, manipulation (consistently using others for one's own end);

(3) inappropriate, intense anger or lack of control, e.g., frequent displays of temper, constant anger;

(4) identity disturbance manifested by uncertainty about several issues relating to identity, such as self-image, gender identity, long-term goals or career choice, friendship patterns, values, and loyalties, e.g., 'Who am I' 'I feel like I am my sister when I am good;'

(5) affective instability: marked shifts from normal mood to depression, irritability, or anxiety, usually lasting a few hours and only rarely more than a few days, with a return to normal mood;

(6) intolerance of being alone, e.g., frantic efforts to avoid being alone, depressed when alone;

(7) physically self-damaging acts, e.g., suicidal gestures, self-mutilation, recurrent accidents or physical fights." Schulz, *The Struggle Toward Ambivalence*, 47 Psychiatry 29 (1984).

In light of the characteristics of a borderline personality, it is essential to the psychiatrist to recognize each of the elements and respond appropriately. Without early and proper detection of the particular phase of the personality that the patient is exhibiting, for example, intense rage, narcissistic entitlement, rapid development of a psychotic transference or compulsivity, the psychia-

trist will be open to potential medical malpractice liability. R. Simon, Clinical Psychiatry and the Law 204 (1987).

In this case, the particular element exhibited by C.B. was a psychotic transference. Both doctors agreed that a transference occurred. However, Dr. Davis states that the transference was based on reality, whereas Dr. Goldberg states that a transference occurred but it was not based on reality or any sexual overtures made by him.

Transference has been defined in many ways, but the most comprehensive definition is:

> "Transference is the primarily unconscious tendency of an individual to assign to others in the present those feelings and attitudes originally connected with significant figures during the course of early development. *** The transference may be either positive (affectionate) or negative (hostile)." R. Simon, Clinical Psychology and the Law 284 (1987).

Intense rage may follow a transference when:

> "this group of patients anticipates rejection and tends to interpret anything except unconditional giving as an abandonment. The expression of rage, therefore, appears in therapy after experiences of fantasied rejection, or *after the therapist is unable to gratify the patient's unrealistic expectations*." (Emphasis added.) (Adler, *Valuing and Devaluing in the Psychotherapatic Process*, 22 Archives of Gen. Psychiatry 454, 456 (1970).)

In light of the characteristics of a borderline patient, this court finds that C.B.'s diagnosis is a crucial element of the Department's complaint. Both parties admit that C.B. has a borderline personality, but disagree on the severity of the illness, and, as such, the court finds that the mental condition of C.B. has been introduced.

Although section 10(a)(1) only requires that either the mental condition or services rendered be a part of the claim, in this case, the services received are in question. The testimony reveals that both Dr. Goldberg and Dr.

Davis have different approaches to the treatment of C.B.'s bulimia. Therefore, this court finds that the first criteria has been met.

The next element of the statute is:

> "Records and communications may be disclosed in [an] *** administrative proceeding *** if and only to the extent ***, the court to which an appeal or other action for review of an administrative proceeding may be taken, finds, after in camera examination of *** other evidence, that is relevant, probative, not unduly prejudicial or inflammatory, and otherwise clearly admissible ***." (Ill. Rev. Stat. 1987, par. 91½, par. 810(a)(1).)

Since this court has already held that the records are relevant to the complaint, the *in camera* inspection becomes imperative to the resolution of this claim. The circuit court must determine whether the records are probative on the issue of whether a possible transference had occurred in past treatments. Furthermore, in light of these particular facts, the circuit court must also determine whether the release of these records for an *in camera* inspection is unduly prejudicial or inflammatory. The *in camera* inspection is important not only to protect the confidentiality expected in a patient-psychiatrist relationship, but also to protect a property interest of the psychiatrist in his license. Last of all, the circuit court must determine whether the records are clearly admissible.

Without an *in camera* inspection of C.B.'s prior experiences in therapy, the court or hearing examiner cannot do justice to any of the parties in the case at bar. Once the court holds an *in camera* inspection without the presence of any of the parties, to make the determinations set out in section 10(a)(1), the court can then hold a hearing with Dr. Davis on the relevancy of the records to be produced to Dr. Goldberg. Thus, the *in camera* inspection in this case "preserve[s] the confidentiality of

the records and communications of persons who are receiving or who have received mental-health services." (*Novak v. Rathnam* (1985), 106 Ill. 2d 478, 483.) Therefore, the circuit court properly ordered an *in camera* inspection under the second criteria of the statute.

The next element within section 10(a) is:

> "that other satisfactory evidence is demonstrably unsatisfactory as evidence of the facts sought to be established by such evidence ***." (Ill. Rev. Stat. 1987, ch. 91½, par. 810(a)(1).)

At this stage of the case, the only evidence to prove or disprove the claim is the testimony of the former psychiatrist, the present treating psychiatrist and the complaining witness. Without further evidence, *i.e.*, past therapy, experiences, etc., the evidence is unsatisfactory. As the testimony reveals, C.B. has had several psychiatrists over a period of 12 years. C.B. has also been hospitalized. Thus, an *in camera* inspection of prior medical records becomes crucial to the furtherance of the proceedings. The *in camera* inspection will be significant to discovering if or when C.B. was previously diagnosed as a borderline personality and when, if any, psychotic transferences occurred. However, this court recognizes that not all medical records from prior treatments will be available, but this court will only grant an *in camera* inspection for those prior records in the possession of Dr. Davis.

The last element of section 10(a)(1) is:

> "that disclosure is more important to the interests of substantial justice than protection from injury to the therapist-recipient [patient] relationship or to the recipient [patient] or other whom disclosure is likely to harm." (Ill. Rev. Stat. 1987, ch. 91½, par. 810(a)(1).)

As stated above, the disclosure of C.B.'s medical records to the court for an *in camera* inspection would protect both parties as well as the psychiatrist-patient relation-

ship. C.B.'s mental illness and the treatment in the past has become a crucial element of the case at bar. The disclosure of the medical records to the circuit court in this case can only enhance the hearing examiner's ability to reach a fair and just result at the administrative level. Although this court recognizes that the confidentiality of a psychiatrist-patient relationship is of utmost importance, we also recognize that disclosure of prior confidential relationships in this case can only further justice.

Finally, even though section 10(a)(1) provides for unconsented disclosure, it also provides another consideration whereby disclosure is permitted if the party seeking disclosure establishes a compelling need for its production. The relevant section of the statute provides:

> "Except in a criminal proceeding in which the recipient, who is accused in that proceeding, raises the defense of insanity, no record or communication between a therapist and a recipient shall be deemed relevant for purposes of this subsection, except the fact of treatment, the cost of services and the ultimate diagnosis unless the party seeking disclosure of the communication clearly establishes in the trial court a compelling need for its production." Ill. Rev. Stat. 1987, ch. 91½, par. 810(a)(1).

In light of the above findings, this court finds that the circuit court acted properly when it ordered the disclosure of C.B.'s medical records for an *in camera* inspection. It is not the propriety of the sexual act that is at issue exclusively, but it is whether the sexual act had occurred. Furthermore, whether the treatment was proper has yet to be established once the hearing resumes. (*Laurent v. Brelji* (1979), 74 Ill. App. 3d 214.) In view of the characteristics of a borderline patient, C.B.'s condition is more than peripherally involved in this case. Therefore, an *in camera* inspection is crucial to this case, not only to protect the privileged and confidential relationship, but also to promote judicial economy in

light of a situation which is at a stalemate, thereby thwarting any attempts to achieve substantial justice.

This court also places within the discretion of the circuit court the determination of whether experts are needed to assess the records prior to or during the *in camera* inspection. This court also places in the discretion of the circuit court the determination of whether to use experts submitted by the parties or a court-appointed expert.

Defendant argues that the medical records sought are too remote. However, at this stage, whether those records are too remote cannot be established because it is uncertain when C.B. was diagnosed with a borderline personality. Thus, it becomes imperative to hold an *in camera* inspection to determine relevancy of those records.

In light of our finding, this court does not find it necessary to address the remaining issues. Thus, the judgment of the appellate court is reversed, the order of the circuit court is affirmed, and this cause is remanded to the circuit court for further proceedings not inconsistent with this opinion.

*Appellate court reversed;*
*circuit court affirmed;*
*cause remanded.*