# Illinois Official Reports

## Appellate Court

---

*Indeck Energy Services, Inc. v. DePodesta*, 2019 IL App (2d) 190043

---

| | |
|---|---|
| Appellate Court Caption | INDECK ENERGY SERVICES, INC., Plaintiff-Appellant, v. CHRISTOPHER M. DePODESTA, KARL G. DAHLSTROM, and HALYARD ENERGY VENTURES, LLC, Defendants-Appellees. |
| District & No. | Second District<br>No. 2-19-0043 |
| Filed | December 30, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 14-CH-602; the Hon. Margaret A. Marcouiller, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | Steven J. Roeder, of Roeder Law Offices LLC, of Chicago, and Robert G. Black, of Law Offices of Robert G. Black, P.C., of Naperville, for appellant.<br><br>Stuart P. Krauskopf, Kurt A. Kauffman, and Jamie S. Ritchie, of Krauskopf Kauffman, P.C., of Chicago, for appellees. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justice Bridges concurred in the judgment and opinion.
Justice McLaren specially concurred, with opinion.


**OPINION**

¶ 1    Plaintiff Indeck Energy Services, Inc. (Indeck), sued defendants Christopher M. DePodesta, Karl G. Dahlstrom, Halyard Energy Ventures, LLC (HEV), and Halyard Energy Wharton, LLC.[1] Indeck alleged breach of contract and sought injunctive relief to enforce its confidentiality and noncompetition agreement (Confidentiality Agreement) against DePodesta and Dahlstrom (count I) and to enjoin them from using or disclosing seven of Indeck's claimed trade secrets (765 ILCS 1065/1 *et seq.* (West 2014)) (count II). Indeck also alleged conspiracy (count III), breach of fiduciary duty (count IV), and usurpation of two corporate opportunities (count V).

¶ 2    During a bench trial, at the close of Indeck's case-in-chief, the trial court directed a finding in defendants' favor on count I, finding that (1) the Confidentiality Agreement was void and unenforceable, (2) Indeck did not prove that it would be irreparably harmed if an injunction did not issue, and (3) Indeck did not prove that it was damaged. Indeck appeals the court's finding that the Confidentiality Agreement was void and unenforceable, but it does not appeal the remaining findings on count I.

¶ 3    As to the count II, the trade secrets claim, the trial court directed a partial finding in defendants' favor, determining that Indeck did not prove that three of the seven claimed trade secrets were entitled to trade secret protection. Indeck does not appeal this ruling.

¶ 4    The trial court also directed a finding in defendants' favor on count V, the usurpation claim, finding that Indeck did not prove that defendants could be held liable for allegedly usurping either of the two corporate opportunities. Indeck appeals the court's finding as to one of the opportunities.

¶ 5    The trial continued on the remaining counts. At the end of defendants' case-in-chief and before the trial court entered its rulings, Indeck moved to reconsider the directed finding on count V. The trial court denied the motion as untimely, finding that, because the motion was filed over one year after the entry of the directed finding, granting it would prejudice defendants. The court also denied the motion on the merits, finding that the opportunity at issue was still available to Indeck in 2013 and at the time of trial. Indeck appeals the denial of its motion to reconsider.

¶ 6    At the end of the trial, the trial court entered judgment in Indeck's favor on count II's remaining four trade secret claims, entering a permanent injunction enjoining defendants from using or disclosing those trade secrets for three years. Indeck does not appeal this ruling. The court dismissed count III as duplicative of count IV. Indeck does not appeal the dismissal.

¶ 7    The trial court also entered judgment in Indeck's favor on count IV, for breach of fiduciary duty, finding that Dahlstrom and DePodesta breached their duties of loyalty to Indeck from

---

[1]Halyard Energy Wharton, LLC, was dismissed as a party and does not participate in this appeal.

March 13, 2013, until their resignations from Indeck in November 2013. It ordered them to disgorge their Indeck salaries for that period. This ruling is not at issue on appeal. The trial court also denied Indeck's request for a constructive trust on the profits that DePodesta and Dahlstrom might earn from their new enterprise and denied Indeck prejudgment interest and disgorgement of any compensation they earned *after* they resigned from Indeck. Indeck appeals only the denial of a constructive trust and of postresignation compensation.

¶ 8 We reverse the trial court's directed finding on the usurpation claim, affirm in all other respects, and remand the case for further proceedings.

¶ 9                                     I. BACKGROUND

¶ 10 Indeck, based in Buffalo Grove, owns, operates, and develops independent power-generation projects. DePodesta, who resides in Elmhurst, was one of the company's officers and its vice president of business development. He had overall responsibility for Indeck's electrical-generation-project development, and his duties were to find new business opportunities and partners and to develop business for Indeck. DePodesta had been an energy developer since 1990. When he started working at Indeck in 2000, he was a project manager. DePodesta left Indeck in 2005 and worked as a mechanical engineer. He returned to Indeck in 2007 as the company's manager of business development, and, in 2011, he became vice president of business development. DePodesta supervised Dahlstrom and Kelly Inns, an engineer. (The three comprised Indeck's business development group.) DePodesta resigned from Indeck on November 1, 2013.

¶ 11 When DePodesta became Indeck's vice president of business development, he was not told what it meant to be an officer or given a copy of the company's bylaws. He had no authority to make decisions for Indeck. He could obtain proposals from consultants and make recommendations, but the decisions on whom to use were made by Larry Lagowski, Indeck's president. DePodesta had the authority to sign contracts, to spend up to $10,000, and to make recommendations for services and products. DePodesta could sign confidentiality agreements on Indeck's behalf but could change only the background section and party names without approval from the company's legal department. Indeck's bylaws provided that only the company's chairman and Lagowski could execute bonds, mortgages, and other contracts, except where the board of directors delegated that power to another officer or agent, including vice presidents.

¶ 12 Dahlstrom, who resides in Winnetka, had been an energy developer since 2002. He began working for Indeck in 2011 as its director of business development and reported to DePodesta. Dahlstrom worked on gas, solar, and wind energy developments. His "job was to find opportunities and bring them back" to Indeck, including those involving "development of turbines" and "potential partners." Dahlstrom resigned from Indeck on November 4, 2013.

¶ 13 In 2010, Dahlstrom formed HEV to consult and provide management and administration services for the development of electric power generation projects. HEV is a Delaware limited liability company that was registered on February 22, 2010. Prior to November 4, 2013, the company operated out of Dahlstrom's residence in Winnetka. DePodesta and Dahlstrom are members of HEV. When DePodesta left Indeck, he went to work for HEV.

¶ 14 In 2011, Lagowski directed DePodesta and Dahlstrom to determine "whether or not it made sense to develop natural gas and, if so, where to go to develop." DePodesta and Dahlstrom prepared a confidential and proprietary natural gas development plan. Indeck's board approved

the development of natural-gas-power-plant projects in the Electrical Reliability Council of Texas (ERCOT),[2] and DePodesta and Dahlstrom identified a site in Wharton County, Texas, for development. (They identified four other sites for development in ERCOT. In 2013, Indeck submitted initial screening studies to ERCOT for seven potential sites.) DePodesta could not sign contracts without Lagowski's prior approval, including for the ERCOT projects. On February 20, 2013, Lagowski sent an e-mail stating, "I don't want anyone signing any contracts on the Texas projects until I've released them."

¶ 15    In August 2013, DePodesta and Dahlstrom were looking for new jobs because they were unhappy at Indeck. That month, they interviewed with Merced Capital Partners, L.P. (Merced), to become consultants and to manage natural-gas-power-plant projects. Again, they resigned from Indeck in November 2013.

¶ 16                        A. The Alleged Corporate Opportunities

¶ 17    Merced is a privately held registered investment adviser that specializes in alternative investment strategies and manages about $2 billion in assets. (It was previously known as EBF & Associates, L.P. (EBF)) Merced Partners III, L.P. (Merced III), one of Merced's investment funds, owns Carson Bay Energy Ventures IV, LLC (Carson Bay).

¶ 18    Indeck alleged that DePodesta and Dahlstrom took from it two opportunities: (1) the contribution of two grey-market (*i.e.*, manufactured but not yet installed or operated) General Electric simple-cycle turbines owned by Carson Bay (Carson Bay turbines) in exchange for equity in Indeck's natural-gas-power-plant development (Turbine Opportunity), and (2) a partnership with Merced to develop natural gas power plants in ERCOT (Funding Opportunity).

¶ 19    Carson Bay purchased the turbines for $19 million each in 2010, hoping to resell them. By 2013, the cost of purchasing, storing, and maintaining the turbines required that Carson Bay sell them for more than $50 million. Merced and Carson Bay had received no offers and were eager to find a purchaser.

¶ 20    On March 5, 2013, Indeck and Carson Bay entered into a mutual confidentiality agreement (MCA). DePodesta signed it on Indeck's behalf. The MCA provided that the parties would enter into discussions concerning both the Funding Opportunity and the Turbine Opportunity. The agreement's initial term was two years, and it precluded the parties from hiring or soliciting each other's employees. On March 8, 2013, Hendrik Vroege, the Merced partner in charge of the Carson Bay turbines, conducted a call in which only DePodesta and Dahlstrom participated for Indeck.

¶ 21    In its complaint, Indeck alleged that DePodesta and Dahlstrom planned to usurp both opportunities, which were within Indeck's line of business. As part of their plan, DePodesta and Dahlstrom pursued Vroege and others at Carson Bay to discuss working with them.

---

[2]"Texas operates an independent and self-contained electric production and transmission grid; its system operator is [ERCOT]. ERCOT is charged with ensuring system reliability, nondiscriminatory access to the transmission and distribution system, access to market information, and clearance of all market transactions." *BP Chemicals, Inc. v. AEP Texas Central Co.*, 198 S.W.3d 449, 451-52 (Tex. App. 2006). "ERCOT is also a term used to refer to the transmission system which provides power to roughly 85 percent of [Texas]." *TXU Generation Co. v. Public Utility Comm'n of Texas*, 165 S.W.3d 821, 827 n.3 (Tex. App. 2005).

- 4 -

Although aware that Carson Bay would consider contributing its turbines to an Indeck project, DePodesta and Dahlstrom provided false information on the subject to Lagowski and senior management. Specifically, they represented to Lagowski that Carson Bay would consider only *selling* its turbines to Indeck and that it required a substantial, nonrefundable down payment on them before it would take the turbines off the market and commit them to a specific Indeck project. DePodesta and Dahlstrom knew that, as they represented it, Carson Bay's position would be unacceptable and would not make business sense to Indeck, as it would require Indeck to pay out millions without knowing if the project was viable. Indeck further alleged that, had this opportunity been fully and fairly presented, it would have agreed to accept the turbines *as equity* in the Wharton project because it would have secured needed turbines much faster than by ordering new ones from a manufacturer and would have significantly reduced uncertainty concerning financing.

¶ 22    Lagowski planned to attend a conference in Las Vegas during the week of April 8, 2013. Correspondence between Lagowski and DePodesta in March 2013 reflected that Lagowski wanted DePodesta to arrange meetings at the conference with people who could help Indeck sell power or become development partners. On a list he provided to Lagowski, DePodesta listed Carson Bay as a private equity firm and a grey-market opportunity provider, and not as a potential developer.

¶ 23    On March 13, 2013, Daniel Barpal, a Carson Bay manager, e-mailed Dahlstrom, asking what the next steps were. In subsequent e-mails, DePodesta and Dahlstrom scheduled a meeting with Barpal, Vroege, and Eric Werwie, another Merced employee, in Houston on April 9, 2013. DePodesta and Dahlstrom knew that Lagowski would be in Las Vegas at that time and unable to attend. They did not advise Lagowski that they had scheduled the meeting. (The trial court discredited DePodesta's and Dahlstrom's testimony that they did not steer Lagowski toward the Las Vegas conference so that they could meet with Carson Bay in Houston and without him.) Later that month, Indeck's board approved development of a "peaking plant"[3] at the Wharton site as a "proof of concept," under which Indeck would develop other peaking projects in ERCOT only *after* it developed Wharton. (DePodesta and Dahlstrom had tried to convince Indeck to develop more than one site at a time in ERCOT.)

¶ 24    During the Houston meeting, DePodesta and Dahlstrom told Vroege that Indeck wanted a "free option" to purchase the Carson Bay turbines. Neither DePodesta nor Dahlstrom was authorized to state this position, and Lagowski testified that such a position was unreasonable and would kill a potential deal.

¶ 25    In addition to selling the Carson Bay turbines, Merced was interested in contributing them as equity in an Indeck project. They were worth about $60 million; thus, contributing them would provide an important financing component in any power-plant project. DePodesta testified that he told Lagowski that Merced was willing to contribute the turbines, but the trial court credited Lagowski's testimony that DePodesta did not tell him this. DePodesta also testified that he told Lagowski that Carson Bay would agree to commit the turbines to an Indeck project only if Indeck made a nonrefundable, undefined multimillion-dollar down payment. Lagowski testified that this would not make sense because Indeck did not have a project yet. The trial court determined that both DePodesta and Dahlstrom wanted Indeck and Merced to

---

[3]A peaking, or "peaker" power plant does not run constantly; it runs when there is a greater need for energy or electricity. In Texas, it runs on very hot or very cold days.

believe that the other was unreasonable so that they would not do business together. The trial court found that Carson Bay had consistently required a 10 to 20% nonrefundable deposit to take the turbines off the market for 30 to 60 days.

¶ 26 On July 22, 2013, Dahlstrom asked William Garth, Indeck's director of finance, to send him Indeck's "most up to date *pro forma*" for the Wharton project. The *pro forma* was a financial model that forecasted project economics, measured potential returns, and served as a preliminary determination of a project's success. Indeck's *pro forma* was central to its business strategy. Garth sent the *pro forma* to Dahlstrom that day. Later that same day, Dahlstrom e-mailed Vroege from his Indeck e-mail address on his Indeck laptop, asking if Vroege had time to catch up about the "GE equipment." Vroege called Dahlstrom at his Indeck office that afternoon. Dahlstrom testified that they spoke about a "request for proposal" that allegedly came out of Duke Power, but the trial court found this testimony incredible and determined that Dahlstrom called Vroege to catch up on the Carson Bay turbines. It further found that Dahlstrom's ultimate goal was to gauge Merced's interest in partnering with DePodesta and Dahlstrom on the development of bigger power plants.

¶ 27 DePodesta testified that, at a July 24, 2013, meeting with Lagowski, DePodesta did not ask whether Indeck would be open to working with Carson Bay and Vroege. He did not mention Carson Bay at all, and he did not include it on the agenda. DePodesta and Dahlstrom confirmed at the meeting that Indeck would adhere to its proof of concept and develop the Wharton project before developing other ERCOT sites it had identified.

¶ 28 On July 24, 2013, Dahlstrom e-mailed Vroege from Indeck, using his HEV e-mail account (and copying DePodesta). He stated that HEV looked forward to presenting its ERCOT development plan and attached a mutual nondisclosure/confidentiality agreement (between EBF and HEV and signed on HEV's behalf by DePodesta and Dahlstrom as HEV's managing directors). The document stated that the parties desired "to exchange certain proprietary and commercially sensitive information in connection with a possible business relationship relating to the development of a portfolio of power plants in the ERCOT region." (The trial court found that DePodesta and Dahlstrom supplied this language, despite Dahlstrom's testimony that it came from EBF/Merced.) DePodesta and Dahlstrom agreed to present their plan to Vroege in Minnesota in August. The trial court determined that the document showed that, before DePodesta and Dahlstrom attended a meeting with Lagowski and Garth on July 24, 2013, DePodesta and Dahlstrom understood that Merced was interested in discussing a partnership to develop power plants in ERCOT.

¶ 29 Between July 24 and August 5, 2013, Dahlstrom put together HEV's power-development strategy. The trial court found that he used Indeck's data and information to do so. For example, from his work at Indeck, Dahlstrom knew of recent negotiations with landowners in Texas concerning option prices for confidential and proprietary sites that he referenced in his budget estimates. Dahlstrom agreed that, on Indeck time, he used Indeck's equipment, material, and facilities to put together the power-development strategy.

¶ 30 On August 6, 2013, DePodesta and Dahlstrom traveled to Minnesota. The following day, Dahlstrom e-mailed Vroege from his HEV e-mail address, stating that they wanted to move forward regarding a potential partnership and that the next step was for EBF/Merced to draft a proposed agreement. Dahlstrom testified that the opportunity to develop ERCOT projects with Merced and its affiliates was a "proposed activity which Indeck had the capacity to engage." The trial court found that Dahlstrom thus judicially admitted that developing such projects was

incident to Indeck's present or prospective business. In the following weeks (through October), using Indeck's time and equipment, DePodesta and Dahlstrom negotiated terms of a letter of intent with Merced III, negotiated with Vroege, and began HEV's operations.

¶ 31 On August 30, 2013, DePodesta, Dahlstrom, and HEV signed a letter of intent with Merced III to form a limited liability company to develop three simple-cycle gas-turbine power-plant projects in Texas. The letter of intent required DePodesta, Dahlstrom, and HEV to deal exclusively with Merced III as they negotiated a limited-liability-company operating agreement (operating agreement) and a management agreement providing for HEV to manage the company (management agreement). They also agreed not to disclose their negotiations to Indeck. Between August 30, 2013, and their departures from Indeck, DePodesta and Dahlstrom negotiated the agreements.

¶ 32 During the week of October 7, 2013, Dahlstrom, along with Lagowski, Garth, and Indeck investment bankers, attended confidential meetings in New York concerning the Wharton project. While in New York, Dahlstrom e-mailed Vroege from his HEV e-mail address, confirming his and DePodesta's intent to move forward with Merced in the near future and reporting on discussions with the investment bankers. The trial court found that Dahlstrom had disclosed to Vroege confidential information obtained from these meetings, against Indeck's best interests. On October 15, 2013, Dahlstrom accessed Indeck's electronic database and copied thousands of business development documents onto an external hard drive, which he removed from Indeck's premises. The documents included Indeck's *pro forma*; a confidential conceptual design report; documents about site locations, prospective land sellers, and the prices of their properties; Indeck's competition tracker; and its development budget. Dahlstrom's explanation for copying the documents was that "it was an emotional time." DePodesta also copied thousands of Indeck documents onto an external hard drive.

¶ 33 DePodesta's resignation from Indeck on November 1, 2013, was effective that day and without prior notice. On that day, he copied his personal storage table (PST), which contained e-mails he sent and received, and he ran a "cleaner" on his Indeck computer. The trial court found incredible DePodesta's testimony that he did not decide to resign until the prior evening. It also determined that documentary evidence—specifically, a draft of the operating agreement that DePodesta received on October 30, 2013, containing terms identical to those in the operating agreement that he and Dahlstrom ultimately signed—contradicted DePodesta's testimony that the negotiations for the agreement were not completed prior to his resignation. The court further found incredible DePodesta's statements to Lagowski during his exit interview that he was leaving Indeck to spend more time at his restaurant. The trial court determined that he "fully intended to develop peaker plants in ERCOT with HEV and EBF/Merced." The court found incredible DePodesta's testimony that "it did not dawn on [him] to tell Mr. Lagowski" that he would be working with an entity that had entered into an MCA with Indeck. The court determined that any disclosure to Lagowski would have violated the confidentiality provisions of the letter of intent and might have caused Indeck to investigate DePodesta's computer.

¶ 34 On November 4, 2013, when Dahlstrom resigned from Indeck, he also copied his PST to an external hard drive and ran a cleaner on his Indeck computer. The trial court found incredible Dahlstrom's explanations for his resignation.

¶ 35 Neither DePodesta nor Dahlstrom disclosed to Indeck their plans to form a limited liability company to develop gas-fired simple-cycle plants in Texas with any affiliate of EBF/Merced,

- 7 -

Merced, Merced III, or Carson Bay.

¶ 36                                  B. MHV

¶ 37        On November 6, 2013, Merced III and HEV formed Merced Halyard Ventures, LLC (MHV), with Merced III owning MHV. MHV was formed to develop, construct, and operate electric-power-generation projects. HEV became a member of MHV and obtained a 20% profit interest in the entity (but no voting interest). The agreement provided its members with defense and indemnification rights in the event of litigation.

¶ 38        That same day, DePodesta and Dahlstrom signed the management agreement, under which HEV, as an independent contractor, became the general manager of MHV's development, construction, and operation of electric-power-generation projects. HEV agreed to devote substantially all of its activities to the advancement of MHV projects. HEV would receive a $500,000 annual management fee, payable biweekly. The initial two-year term of the agreement was extended to December 31, 2018. As of December 31, 2017, HEV received $2.075 million (and $2.5 million as of November 6, 2018) in fees, which were split equally between DePodesta and Dahlstrom. When asked about negotiations between HEV and Merced III from August 2013 through DePodesta's resignation from Indeck, DePodesta testified that they were negotiating the management agreement and the operating agreement.

¶ 39        The operating agreement did not prevent any member or affiliate from engaging in any activities, whether or not they were competitive with MHV. Merced, thus, could partner with any entity, including Indeck, to pursue any opportunity, in the ERCOT region or elsewhere. Lagowski testified that, after DePodesta and Dahlstrom resigned, Indeck never contacted Merced about partnering on any project, including one for which Merced would provide development funding. Also, Indeck never presented to Merced a business plan seeking development funding.

¶ 40        HEV, DePodesta, and Dahlstrom developed two construction-ready peaker projects in Texas: (1) the Halyard Wharton Energy Center (HWEC) and (2) the Halyard Henderson Energy Center. Dahlstrom believed that there was funding available to build such projects. In late January 2018, HEV issued a confidential memorandum to qualified parties interested in acquiring equity interests in HWEC through Scotiabank, an investment bank. The trial court found that DePodesta and Dahlstrom would likely receive at least $4.67 million for their 20% profit interest in MHV if the projects were sold, given the developer fee budgeted in the memorandum. Dahlstrom testified that he expected to obtain a power purchase agreement for the projects. The trial court determined that projects sold with these agreements would be valued at about $35 million, with DePodesta and Dahlstrom likely receiving in excess of $13 million ($6.5 million each) for their 20% profit interest.

¶ 41        At the time of trial, MHV had not earned any profits. If it ever does earn a profit, HEV will not participate in that profit until after Merced III receives all of its initial investment (*i.e.*, its $1 million capital contribution) plus a 10% preferred annual rate of return, compounded annually. Mark Kubow, Indeck's expert witness, testified that he could not opine, to a reasonable degree of certainty, what an operational development in ERCOT would sell for or what profits DePodesta and Dahlstrom would receive from any future development. He testified that there have been projects where no development fee is paid to the developers. To know what DePodesta and Dahlstrom would receive, if anything, MHV would have to have sold one or both of its construction-ready projects to determine whether any sale proceeds were

earmarked for a development fee. Further, even if a sale happened and MHV received a development fee, there is no guarantee that DePodesta and Dahlstrom would share any of it after the fee flowed through the operating agreement's distribution structure.

¶ 42 There is no certainty, Dahlstrom testified, that MHV's projects will be financed and built. There are a number of obstacles to overcome before a project can generate revenue, including securing a power purchase agreement to sell power, obtaining financing, and addressing potential construction and operation risks.

¶ 43 The trial court found that ERCOT is a very speculative market. Market conditions in the spring of 2017 were poor. However, the trial court found, Dahlstrom credibly testified in February 2018 that ERCOT was approaching the summer of 2018 with a reserve margin below 10%, when ERCOT shoots for a 13.75% margin.

¶ 44 C. Indeck's Complaint and the Trial Court Proceedings

¶ 45 On March 25, 2014, Indeck sued defendants. In count I, it alleged breach of contract and sought injunctive relief to enforce its Confidentiality Agreement as to DePodesta and Dahlstrom. In count II, Indeck sought to enjoin defendants from using or disclosing seven of Indeck's claimed trade secrets. In count III, it alleged conspiracy and sought injunctive relief. In count IV, Indeck alleged breach of fiduciary duty, seeking disgorgement of all benefits defendants had and would obtain from breaching their duties of loyalty to the company. Finally, in count V, filed later, Indeck alleged usurpation of the Funding Opportunity and the Turbine Opportunity.

¶ 46 Trial commenced on January 25, 2016. After Indeck's case-in-chief, defendants moved for a directed finding on count I (735 ILCS 5/2-1110 (West 2016)), arguing that the Confidentiality Agreement was unenforceable. The trial court granted the motion, finding that the Confidentiality Agreement was unenforceable because it covered information of any nature or form related to Indeck's business, was not limited to protecting information that gave Indeck an advantage over its competitors, and was unreasonable as to duration.

¶ 47 Defendants also moved for a directed finding on count V, arguing in part that the Funding Opportunity was equally available to Indeck. They cited the operating agreement, arguing that it did not expressly prohibit Merced III from investing in other development companies. The trial court granted defendants' motion, finding that, with respect to the Funding Opportunity, there was no evidence that Merced promised HEV an exclusive agreement or that Indeck made any attempt to partner with Merced after DePodesta and Dahlstrom resigned from Indeck. The Funding Opportunity that Indeck had in 2013, the court found, was still available to Indeck in 2017. Indeck assumed that there was only one partnership opportunity with Merced, but it presented no evidence of that.

¶ 48 At the close of evidence, Indeck moved to reconsider the directed finding on count V. The trial court denied the motion as untimely, because it was not brought until after defendants' case-in-chief, and denied it on the merits because the opportunity was always available to Indeck and could not be deemed to have been taken from it.

¶ 49 On December 10, 2018, at the conclusion of the trial, the trial court ruled on 249 findings of fact proposed by Indeck and 540 findings of fact proposed by defendants. It also ruled on the remaining counts. On count II, the trade secrets count, the court ruled in Indeck's favor and entered a permanent injunction enjoining defendants for three years from using or disclosing

the remaining four trade secrets, specifically regarding the locations of four potential development sites in ERCOT, a report containing cost estimates for the Wharton project, and the *pro forma*. This ruling is not at issue on appeal.

¶ 50    On count IV, the trial court found that DePodesta and Dahlstrom breached their fiduciary duties to Indeck. It found that they violated their duties of loyalty in 2013, with the earliest violation occurring on March 13, 2013. They also violated their duties when they set up the meeting with Vroege when Lagowski could not attend and then (1) told Vroege that Indeck wanted a free option on the turbines, when they lacked the authority to make such a representation and knew that it would discourage further discussion with Indeck, and (2) discussed Merced's potential investment in HEV but never disclosed the discussions to Indeck. The court also determined that DePodesta and Dahlstrom violated their duties to Indeck when they contacted Vroege from Indeck's office on July 23, 2013, to tell him that they were starting their own company and discussed with him the following day (using Indeck's phone service) the possibility of Merced funding defendants' enterprise. They further violated their duties by accessing Indeck's materials to prepare for the HEV meeting with Vroege and by preparing HEV's power-development strategy using Indeck's forms, time, and equipment. They also downloaded thousands of documents and took the records with them, intending to use them to support their new enterprise. DePodesta and Dahlstrom then attempted to destroy the evidence of their downloading activity. They also violated their duties when, on Indeck's time, they traveled to Minnesota to present the HEV power-development strategy to Merced and entered into an agreement to exchange proprietary information with Merced. Defendants also, on Indeck's time and using its equipment and phone service, negotiated a letter of intent in which "they agree[d] not to disclose their negotiations to Indeck even though their jobs at Indeck required them to bring development opportunities to Indeck's attention." The court further found that DePodesta and Dahlstrom violated their duties when they negotiated the operating agreement and the management agreement, again using Indeck's time and equipment. It also found that Dahlstrom violated his duty when he encouraged Inns to look for a new job when he knew that he and DePodesta were going to leave Indeck and that, if all three left, there would be greater damage to Indeck.

¶ 51    The court ordered DePodesta and Dahlstrom to disgorge their Indeck salaries for the period of disloyalty ($111,868 for DePodesta and $93,106 for Dahlstrom). This ruling is not at issue on appeal. The court denied Indeck's requests for a constructive trust on the profits that DePodesta and Dahlstrom might earn from MHV's business, prejudgment interest, and disgorgement of any compensation they earned *after* they resigned from Indeck. The court found "speculative at best," and not proven at trial, Indeck's argument that "every penny Defendants received from Merced[ ]" was due to their disloyalty to Indeck. Their breaches, it further found, ended with their employment at Indeck. As to disgorgement and a constructive trust on potential future benefits, the court determined that it could not issue such an order on hypothetical future benefits where ERCOT is a volatile and speculative market and no one knows if DePodesta and Dahlstrom will obtain any future benefits. Any such damages are speculative and uncertain and "hypothetical future benefits [are] not *** identifiable fund[s] traceable to a breach such that [they] can become the *res* of a proposed trust." Indeck appeals the denial of postresignation compensation and a constructive trust.

¶ 52    The trial court dismissed count III as duplicative of count IV. The dismissal is not at issue on appeal.

¶ 53 The court generally noted that it found that DePodesta intentionally withheld from Lagowski the fact that he and Dahlstrom had laid the groundwork for HEV's relationship with Vroege and Merced and had done so using Indeck's resources. The trial court explained that its findings concerning DePodesta's and Dahlstrom's credibility were reinforced by their discovery violations. It also noted that it found that Lagowski, Inns, and Garth were more credible than DePodesta and Dahlstrom and that any conflicts were resolved in Indeck's witnesses' favor. Indeck appeals.

¶ 54                                   II. ANALYSIS
¶ 55                    A. Count V (Usurpation of Corporate Opportunity)
¶ 56 Indeck first challenges aspects of the trial court's ruling on count V, which alleged usurpation of corporate opportunities. Indeck argues that the court (1) misapplied the relevant standard in granting defendants' motion for a directed finding, (2) erred in finding that DePodesta and Dahlstrom did not usurp the Funding Opportunity, and (3) erred in denying Indeck's motion to reconsider the directed finding. For the following reasons, we conclude that the trial court erred in determining that Indeck did not present sufficient evidence in its case-in-chief to show that there was a usurpation.

¶ 57 Section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2018)) allows a defendant to move for a directed finding at the close of the plaintiff's case in a bench trial. To rule on such a motion, the trial court must engage in a two-step analysis. *Edward Atkins, M.D., S.C. v. Robbins, Salomon & Patt, Ltd.*, 2018 IL App (1st) 161961, ¶ 53. First, it must decide whether the plaintiff has presented a *prima facie* case as a matter of law by producing some evidence on every element necessary to its cause of action. *Id.* If not, the trial court must grant the motion and enter judgment in the defendant's favor. *Id.* If the plaintiff has established the elements of a *prima facie* case, then the trial court must consider the credibility of the witnesses, draw reasonable inferences therefrom, and generally consider the weight and quality of the evidence. *Id.* ¶ 54. If sufficient evidence exists for the plaintiff's *prima facie* case to survive, the trial court should deny the defendant's motion and continue the trial. *Id.* Where the evidence is not sufficient, the trial court should grant the motion and enter judgment in the defendant's favor. *Id.*

¶ 58 "Generally, if the court grants the motion at the first step of the section 2-1110 analysis, our standard of review is *de novo*, whereas if the court grants the motion at the second step, our standard of review is the manifest-weight standard." *Id.*

¶ 59 "It is undisputed that the individuals who control corporations owe a fiduciary duty to their corporation and its shareholders." *Graham v. Mimms*, 111 Ill. App. 3d 751, 761 (1982). Indeed, "[e]mployees as well as officers and directors owe a duty of loyalty to their employer." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69 (citing *Mullaney, Wells & Co. v. Savage*, 78 Ill. 2d 534, 546-47 (1980), and *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 514, 529 (1993)). "[A] fiduciary cannot act inconsistently with his [or her] agency or trust and cannot solicit his [or her] employer's customers for himself [or herself]." *Id.* To state a claim for breach of a fiduciary duty, a plaintiff must allege the existence of a fiduciary duty, the breach of that duty, and damages proximately caused therefrom. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000).

¶ 60 Usurpation of corporate opportunity is a claim based in equity. *Tarin v. Pellonari*, 253 Ill. App. 3d 542, 550-51 (1993). The corporate-opportunity doctrine is "a subspecies of the

- 11 -

fiduciary duty of loyalty." Eric Tally, *Turning Servile Opportunities to Gold: A Strategic Analysis of the Corporate Opportunities Doctrine*, 108 Yale L.J. 277, 279 (Nov. 1998). The doctrine prohibits a corporation's fiduciary from misappropriating corporate property and from taking advantage of business opportunities that belong to the corporation. *Graham*, 111 Ill. App. 3d at 762. The general rule is that

> "when a corporation's fiduciary wants to take advantage of a business opportunity which is in the corporation's line of business, *** the fiduciary must first disclose and tender the opportunity to the corporation, notwithstanding the fact that the fiduciary may have believed that the corporation was legally or financially incapable of taking advantage of the opportunity." *Id.* at 765.

Furthermore, after the fiduciary discloses and tenders the corporate opportunity, he or she cannot begin to act on his or her own "without the consent" of the corporation. *Mullaney*, 78 Ill. 2d at 549; *Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126, ¶¶ 40-42.

¶ 61    In determining whether there was a breach of fiduciary duty *under the corporate-opportunity doctrine*, we begin by assessing whether there was a corporate opportunity and, if so, whether there was a misappropriation of the opportunity. *Advantage Marketing Group*, 2019 IL App (1st) 181126, ¶ 34. "A corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage." *Lindenhurst Drugs, Inc. v. Becker*, 154 Ill. App. 3d 61, 67 (1987).

¶ 62    In *Kerrigan v. Unity Savings Ass'n*, 58 Ill. 2d 20 (1974), the key supreme court case in this area, a bank shareholder brought a derivative suit, alleging that several bank directors opened an insurance agency to take advantage of insurance business from bank customers without first offering that business to the bank. The defendants admitted that they did not offer the business to the bank, but they argued that the banking statute prohibited a bank from selling insurance. The supreme court upheld the reversal of summary judgment for the defendants. *Id.* at 31-32. It first held that the bank could have sold insurance and that it therefore did not have to address the defendants' duties if the bank could not have sold insurance. *Id.* at 27. However, the court then stated that the defendants' incorrect belief that the bank could not sell insurance "cannot operate as a substitute for defendants' duty to present the question to [the bank] for [the bank's] independent evaluation." *Id.* at 28. The court continued:

> "[I]f the doctrine of business opportunity is to possess any vitality, the corporation or association must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations. If directors fail to make such a disclosure and to tender the opportunity, the prophylactic purpose of the rule imposing a fiduciary obligation requires that the directors be foreclosed from exploiting that opportunity on their own behalf." *Id.*

¶ 63    Here, the trial court entered a directed finding in defendants' favor on the usurpation claim, finding that Indeck did not prove that defendants could be held liable for allegedly taking either of two corporate opportunities. As to the Funding Opportunity, which is at issue on appeal, the court found that there was "no evidence that Merced promised HEV an exclusive development agreement for projects in ERCOT or that Indeck made any attempt to partner with Merced after Defendants resigned from Indeck." The court noted that Indeck "may have assumed that

- 12 -

there was only one partnership opportunity with Merced, but [Indeck] presented no evidence of that fact in its case in chief." It found persuasive defendants' argument that "no funding opportunity was usurped and that any funding opportunity that Indeck might [have] had in 2013 is still available to Indeck today."

¶ 64    Indeck argues that the trial court erred in directing a finding on the usurpation claim, as the evidence presented during its case-in-chief established that DePodesta and Dahlstrom usurped Indeck's corporate opportunity to partner with Merced and its affiliates to develop projects in ERCOT, *i.e.*, the Funding Opportunity. This evidence, they note (and the trial court found), included DePodesta's judicial admission that the opportunity "to develop projects with Carson Bay and its affiliates" was "an activity that was incident to Indeck's present or prospective business." Further, Indeck's interest in developing peaker plants in ERCOT with Carson Bay and its affiliates was the very reason Indeck signed the MCA. As the trial court found, DePodesta and Dahlstrom developed this opportunity for themselves by using Indeck's corporate assets. Thus, Indeck argues, defendants are estopped from denying that this opportunity was in Indeck's line of business or that Indeck had the capacity to engage in the same. Furthermore, Indeck contends, as a result, it needed to prove only that DePodesta and Dahlstrom were employees who *failed to disclose* the funding opportunity before they exploited it. DePodesta and Dahlstrom, they note, both admitted that they did not disclose the opportunity to Lagowski at the July 24, 2013, meeting that DePodesta scheduled, even though they had spoken with Vroege about it that very morning. They also admitted (and the trial court found) that they *never* disclosed it at *any* time, before or after they resigned. Indeck further notes that the trial court found that DePodesta and Dahlstrom never disclosed to Lagowski that they had executed a letter of intent with Merced III and that they planned to form a limited liability company (ultimately MHV) to develop simple-cycle gas-turbine projects in Texas with Merced or any of its affiliates. "Since they did not disclose it, they did not tender any such opportunities to Indeck or obtain its consent to their taking the same."

¶ 65    We conclude that the trial court erred in granting defendants' motion for a directed finding on Indeck's usurpation claim. Indeck owns, operates, and develops independent power generation projects. In 2013, it sought to access the ERCOT market and initiated activities toward achieving this end. For example, Indeck submitted to ERCOT initial screening studies for seven potential sites where it could develop natural-gas-power-plant projects. DePodesta and Dahlstrom identified a site in Wharton County, Texas. On March 5, 2013, Indeck and Carson Bay entered into the MCA, which provided that the parties would enter into discussions concerning both the Funding Opportunity and the Turbine Opportunity. (The Turbine Opportunity is not an issue on appeal.) In April 2013, Indeck's board approved the development of the Wharton site as a "proof of concept," under which Indeck would develop other peaking projects in ERCOT only *after* it developed Wharton. DePodesta and Dahlstrom admitted that the opportunities that Carson Bay presented to Indeck to develop projects were within Indeck's line of business. As noted, "[a] corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage." *Lindenhurst Drugs*, 154 Ill. App. 3d at 67. Based on the foregoing, it is a rather straightforward conclusion that the potential to develop projects with Merced and its affiliates in Texas was a corporate opportunity for Indeck.

¶ 66    The remaining question is whether Indeck presented sufficient evidence in its case-in-chief that DePodesta and Dahlstrom usurped that opportunity. We conclude that it did and that the

trial court erred in finding otherwise and directing a finding in defendants' favor. In November 2013, DePodesta, Dahlstrom, and Merced III formed MHV to *develop, construct, and operate electric-power-generation projects in ERCOT*, an activity identical to the ultimate goal of the Funding Opportunity, which was the *development of simple-cycle gas-turbine projects in ERCOT*. DePodesta and Dahlstrom did not disclose and tender this opportunity to Indeck or seek its consent to pursue it. This answers in the affirmative the corporate-usurpation question. We reject defendants' argument that DePodesta and Dahlstrom merely obtained new jobs. They clearly entered into a business venture that is reasonably incident to Indeck's present or prospective line of business. *Kerrigan*, 58 Ill. 2d at 28; *Lindenhurst Drugs*, 154 Ill. App. 3d at 67-68.

¶ 67        *Cooper Linse Hallman Capital Management, Inc. v. Hallman*, 368 Ill. App. 3d 353 (2006), upon which defendants rely, is distinguishable. There, the reviewing court found no usurpation of corporate opportunity. *Id.* at 359. The plaintiff, an investment corporation, established a sector fund with another firm, and several of its principals and the defendants, an officer and an office manager, each also opened a personal sector fund with the outside firm. The defendants later incorporated a competing business, typed a business plan on the plaintiff's computer, and did not inform the plaintiff of their plan to start a competing business. The reviewing court upheld the trial court's judgment for the defendants, holding that they did *not* usurp a corporate opportunity to capitalize on the plaintiff's sector funds. *Id.* While the defendants might have advertised their personal sector funds' successes to lure potential customers to their new corporation, the "plaintiff offered no evidence that it cannot *also* capitalize on its success with its Rydex sector fund." (Emphasis added.) *Id.* That is, there was no reason that only one corporation could offer this form of investment. *Id.*

¶ 68        We disagree with defendants that *Hallman* supports a finding that the opportunity to develop simple-cycle gas-turbine projects in ERCOT, a market that encompasses over 85% of Texas, where Merced and its affiliates—the potential partners in such an enterprise—are not exclusively bound to a particular partner, does not constitute usurpation of a corporate opportunity. In our view, the opportunity that DePodesta and Dahlstrom pursued (according to Indeck's case-in-chief) was clearly within Indeck's line of business, and their failure to disclose it to Indeck, precluded Indeck from determining whether to pursue it.

¶ 69        At the conclusion of Indeck's case-in-chief, the trial court found that DePodesta and Dahlstrom did not hinder or preclude Indeck from pursuing corporate opportunities with Merced or its affiliates (which Indeck had already been pursuing when it entered into the MCA with Carson Bay) or any other entity in ERCOT. It determined, "It appears that [Indeck] may have assumed that there was only one partnership opportunity with Merced, but [Indeck] presented no evidence of that fact in its case in chief." The court found "persuasive" defendants' argument that no funding opportunity was usurped and that "any funding opportunity that Indeck might have had in 2013 is still available to Indeck today." We hold that the trial court erroneously focused on the fact that Merced did not promise HEV (in either the operating or the management agreement) an exclusive development agreement. The proper focus was whether the opportunity DePodesta and Dahlstrom took was within Indeck's line of business (it was) and whether it was disclosed, tendered, and consented to (it was not).

¶ 70        This case presents unusual facts. As defendants note, corporate opportunity cases typically involve an opportunity that is available to one party or the other, but not both. See, *e.g.*, *Kerrigan*, 58 Ill. 2d at 29 (the defendants caused the plaintiff to " 'refer' " its borrowers to the

defendants' entity, "whose office was strategically located in the same building"); *Lindenhurst Drugs*, 154 Ill. App. 3d at 70 (former director of the plaintiff corporation purchased for himself a franchise in which the plaintiff was interested that was in the same shopping center as the plaintiff's store); *Comedy Cottage, Inc. v. Berk*, 145 Ill. App. 3d 355, 360-61 (1986) (after the plaintiff's lease had been terminated, the defendant acquired a lease to the plaintiff's premises and established a rival business there); see also William Lynch Schaller, *Corporate Opportunities and Corporate Competition in Illinois: A Comparative Discussion of Fiduciary Duties*, 46 J. Marshall L. Rev. 1, 18 (Fall 2012) ("Strictly speaking, corporate opportunity cases are characterized by a particular and narrow fact pattern: (1) a third party presents an identifiable, concrete deal relating to the corporate employer's business, such as the chance to purchase the building housing the employer's business; (2) *the deal is a 'zero-sum' game in the sense that only the corporate employer or its fiduciary—but not both—can seize it, leaving the loser permanently shut out*; and (3) the fiduciary diverts the deal to himself [or herself], whether before or after his [or her] resignation." (Emphasis added.)). However, the facts here lead to a clear conclusion that Indeck presented sufficient evidence in its case-in-chief that DePodesta and Dahlstrom breached their duties to Indeck. Because there is sufficient evidence that defendants usurped a corporate opportunity, we find, under these facts, that it is immaterial whether additional opportunities were (or still are) available for Indeck to partner with Merced or its affiliates. To hold otherwise would *not* be consistent with the prophylactic purpose of the fiduciary rules to allow DePodesta and Dahlstrom to exploit an opportunity (even if it is one of many) consistent with Indeck's business, without first disclosing and tendering the opportunity to Indeck and obtaining its consent. *Kerrigan*, 58 Ill. 2d at 28; *Advantage Marketing*, 2019 IL App (1st) 181126, ¶¶ 40-42.

¶ 71    In summary, the trial court erred in granting defendants' motion for a directed finding. Indeck argues that, if we reverse the trial court, we should remand this case with directions that judgment be entered against defendants. Defendants respond that they did not present any evidence in their defense and should be allowed to do so on remand. They further argue that, even if we conclude that defendants usurped a corporate opportunity, we must remand on the issues of proximate cause and damages. Where a trial court erroneously enters a directed finding, the remedy is to remand for the court to proceed with the trial as if the motion had been denied or waived. *Anest v. Audino*, 332 Ill. App. 3d 468, 480 (2002). Accordingly, we reverse and remand for the court to proceed with the trial on count V, including defendants' presentation of their case on all elements of the usurpation claim.[4]

¶ 72                      B. Count IV—Breach of Fiduciary Duty

¶ 73    Next, Indeck challenges two aspects of the trial court's assessment of their breach of fiduciary duty claim. First, it argues that, after finding defendants liable on this count, the court erred in denying disgorgement of any compensation defendants received under the management agreement. Next, it contends that the court erred in declining to order a

---

[4]We note that the measure of damages on the usurpation claim—the benefit to defendants—differs from the measure of damages on the breach-of-fiduciary-duty claim—the loss to Indeck—that we address below. Nothing in our analysis of the fiduciary-duty claim should be construed on remand to affect or limit Indeck's damages on the usurpation claim.

constructive trust over defendants' 20% profit interest in MHV. For the following reasons, we reject Indeck's arguments.

¶ 74    Again, to state a claim for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary duty, the breach of that duty, and damages proximately caused therefrom. *Neade*, 193 Ill. 2d at 444. It lies within the equitable discretion of the trial court to determine the appropriate remedy for a breach. *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1071 (2001).

¶ 75    The trial court entered judgment in Indeck's favor on its breach of fiduciary duty claim. The court found that both DePodesta and Dahlstrom owed Indeck a duty of loyalty during their periods of employment with Indeck and that both breached their duties in 2013, with the earliest violation occurring on March 13, 2013. The breaches that the trial court found included setting up the meeting with Vroege to ensure that Lagowski would not attend; telling Vroege, without authority, that Indeck wanted a free option on the Carson Bay turbines and knowing that this representation would discourage further discussion with Indeck; discussing Merced's potential investment in HEV but not disclosing the discussions to Indeck; contacting Vroege from Indeck's offices on July 23, 2013, to tell him that they were starting their own company; discussing with him the following day, using Indeck's phone service, the possibility of Merced funding defendants' enterprise; accessing Indeck's materials to prepare for the HEV meeting with Vroege; preparing HEV's power development strategy using Indeck's forms, time, and equipment; downloading and taking thousands of Indeck records, intending to use them to support their new enterprise; attempting to destroy the evidence of their downloading activity; traveling to Minnesota on Indeck's time to present the HEV power development strategy to Merced; entering into an agreement with Merced to exchange proprietary and sensitive information; negotiating, on Indeck's time and using its equipment and phone service, a letter of intent (wherein they agreed not to disclose their negotiations to Indeck, even though their positions at Indeck required them to bring development opportunities to Indeck's attention); negotiating the operating agreement and the management agreement, again using Indeck's time and equipment; and, as to Dahlstrom only, encouraging Inns to look for a new job when DePodesta and Dahlstrom were preparing to leave Indeck and knew that if all three left there would be greater damage to Indeck.

¶ 76    The trial court ordered DePodesta and Dahlstrom to disgorge their Indeck salaries for the period of disloyalty ($111,868 for DePodesta and $93,106 for Dahlstrom). This ruling is not at issue on appeal. Further, the court denied Indeck's request for disgorgement of the compensation (*i.e.*, the management fees) they earned *after* they resigned from Indeck, and it denied a constructive trust on the profits that DePodesta and Dahlstrom might earn from MHV's business.[5] Their breaches, the trial court found, ended with their employment at Indeck. The court also found "speculative at best," and not proven at trial, Indeck's argument that all money DePodesta and Dahlstrom received from Merced/HEV was due to their disloyalty to Indeck. As to disgorgement and a constructive trust on potential future benefits, the court determined that it could not issue such an order on hypothetical future benefits where ERCOT is a volatile and speculative market and no one knows if DePodesta and Dahlstrom will obtain any future benefits. The court reiterated that any such damages are speculative and uncertain and "hypothetical future benefits [are] not *** identifiable fund[s] traceable to a

---

[5]Indeck disclaimed damages.

breach such that [they] can become the *res* of a proposed trust."

¶ 77                                    1. Disgorgement of Management Fees

¶ 78    Indeck argues that the trial court's finding that no fees paid to DePodesta and Dahlstrom under the management agreement resulted from their disloyalty was against the manifest weight of the evidence. Indeck contends that, although the court found that DePodesta and Dahlstrom breached their fiduciary duties, it erred in ruling that their breaches *ended* when DePodesta and Dahlstrom *resigned* from Indeck. As of November 6, 2018, it notes, $2.5 million in fees were paid to HEV, which were split equally between DePodesta and Dahlstrom. Indeck claims that these fees were a benefit that they received *as a result of* breaching their duties.

¶ 79    "An employer may recover an employee's total compensation paid during the time period that an employee was breaching fiduciary duties owed the employer." *Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 165 (1993) (at a minimum, the plaintiff was entitled to the compensation it paid former employees before they resigned or were terminated, when they were soliciting customers and other employees); see also *Smith-Schrader Co. v. Smith*, 136 Ill. App. 3d 571, 578 (1985) (court's finding of officer's liability for solicitation of employees was based on the principle that an officer will be liable for transactions *completed* after termination of relationship with the corporation if they were founded on information acquired during the relationship; since the officer's relationship with the employees was established before he resigned, the officer was liable).

¶ 80    We conclude that the trial court did not err in denying disgorgement of DePodesta's and Dahlstrom's postresignation compensation. It reasonably found that any breach ended when DePodesta and Dahlstrom resigned from Indeck. The court noted that Indeck had not cited any case law for the proposition that a former employee can be compelled to disgorge any compensation he or she receives *after* the breach of a fiduciary duty to his or her former employer. It reasonably found speculative Indeck's argument that all money DePodesta and Dahlstrom received from Merced/HEV was due to their disloyalty to Indeck. Clearly, the activities noted above that the court determined constituted breaches of DePodesta's and Dahlstrom's fiduciary duties to Indeck occurred *during* their employment with the company. Although those activities related to a new enterprise, none continued after they resigned from Indeck.

¶ 81                                            2. Constructive Trust

¶ 82    Next, Indeck argues that the trial court erred in declining to enter a constructive trust on DePodesta's and Dahlstrom's profits from MHV. Indeck disagrees with the trial court's assessment that such profits were speculative and argues that they would stem from DePodesta's and Dahlstrom's acts of disloyalty. We reject Indeck's arguments.

¶ 83    A constructive trust may be imposed, even when it more than compensates the plaintiff for damages resulting from an employee's breach of loyalty, because the right to recover from one who exploits his or her fiduciary position for his or her personal benefit is triggered by the gain to the agent rather than by the loss to the principal. *City of Chicago ex rel. Cohen v. Keane*, 64 Ill. 2d 559, 565-66 (1976). The imposition of a constructive trust in such circumstances reflects the "wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation."

- 17 -

(Internal quotation marks omitted.) *Graham*, 111 Ill. App. 3d at 762-63. Furthermore, although "[a] constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct," "[t]he proceeds of the alleged wrongful conduct must exist as an *identifiable* fund traceable to that conduct, such that it can become the *res* of the proposed trust." (Emphasis added.) *Eychaner v. Gross*, 202 Ill. 2d 228, 274 (2002). Indeed, evidence as to damages that is "speculative, remote or based upon mere probability is improper." *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 45 (2009).

¶ 84   The trial court determined that it could not order "disgorgement of a hypothetical future benefit." It found that ERCOT is a "volatile and speculative market and no one knows whether Defendants will obtain any future benefits." Benefits in this case, it further determined, were "uncertain," and "purely speculative." The court also found that "hypothetical future benefit[s] [are] not *** identifiable fund[s] traceable to a breach such that [they] can become the *res* of a proposed trust." It noted that Indeck had failed to prove that DePodesta and Dahlstrom "will profit handsomely" after trial.

¶ 85   Kubow, Indeck's expert witness, testified that he could not opine, to a reasonable degree of certainty, what profits DePodesta and Dahlstrom would receive from any future development. To know what DePodesta and Dahlstrom would receive, if anything, MHV would have to have sold one or both of its construction-ready projects to determine whether any sale proceeds were earmarked for a development fee. He testified that there have been projects where no development fee is paid to the developers. Further, even if a sale happened and MHV received a development fee, there is no guarantee that DePodesta and Dahlstrom would share any of it after the fee flowed through the operating agreement's distribution structure. Given this evidence, the speculative nature of any profits from MHV formed a reasonable basis for the trial court's order declining to impose a constructive trust on those profits. The evidence showed that developments in ERCOT are speculative and uncertain in many respects.

¶ 86                    C. Count I—Breach of Confidentiality Agreement

¶ 87   Next, Indeck argues that the trial court erred in granting defendants a directed finding on its breach of contract claim, which sought injunctive relief to enforce its Confidentiality Agreement. Defendants respond that we need not review the trial court's ruling that the Confidentiality Agreement was unenforceable because the disposition of the issue is not essential and will not affect the trial court's decision to decline to enter a permanent injunction. We agree with defendants.

¶ 88   "The party seeking an injunction must demonstrate: '(1) a clear and ascertainable right in need of protection; (2) irreparable harm if injunctive relief is not granted; (3) no adequate remedy at law; and (4) success on the merits.' " *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 743-44 (2009) (quoting *Hasco, Inc. v. Roche*, 299 Ill. App. 3d 118, 126 (1998)). To show a breach of contract, a plaintiff must prove (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) resultant injury to the plaintiff. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 85.

¶ 89   The trial court found the Confidentiality Agreement overbroad but *also* determined that Indeck did *not* prove that (1) it would be irreparably harmed if the injunction did not issue and (2) it sustained injury on the underlying breach of contract claim. As defendants note, Indeck

does not challenge these two rulings. Thus, they are forfeited, and regardless of whether the Confidentiality Agreement is enforceable, the trial court's directed finding in defendants' favor stands on these other grounds.

### III. CONCLUSION

For the reasons stated, the judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

Affirmed in part and reversed in part.

Cause remanded.

JUSTICE McLAREN, specially concurring:

I wish to emphasize a point addressed to the trial court. In a similar case, where the trial judge retired and was replaced with a successor judge, this district said, "the trial court violated their due process rights when, over their objection, the court relied on a transcript of their case-in-chief from a prior trial on their complaint rather than let them present their case-in-chief anew before the court. We reverse and remand." *Anderson v. Kohler*, 376 Ill. App. 3d 714, 714-15 (2007). "A stitch in time may save nine." Thomas Fuller, Gnomologia: Adagies and Proverbs; Wise Sentences and Witty Sayings, Ancient and Modern, Foreign and British (1732).