**2021 IL 125733**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 125733)

INDECK ENERGY SERVICES, INC., Appellee, v. CHRISTOPHER M. DEPODESTA *et al.*, Appellants.

*Opinion filed July 29, 2021.*

CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Theis, Neville, and Michael J. Burke concurred in the judgment and opinion.

Justice Overstreet dissented, with opinion, joined by Justices Garman and Carter.

## OPINION

¶ 1      Plaintiff, Indeck Energy Services, Inc. (Indeck), sued two of its former employees alleging, *inter alia*, breach of contract, breach of fiduciary duties, and

usurpation of a corporate opportunity. On the breach of contract claim (count I) and the usurpation of a corporate opportunity claim (count V), the Lake County circuit court directed findings in favor of defendants. On the breach of fiduciary duties claim (count IV), the court ruled in favor of plaintiff following a bench trial.

¶ 2 On appeal, the appellate court affirmed the trial court's rulings on counts I and IV but reversed on count V. 2019 IL App (2d) 190043. Defendants appeal to this court, challenging the appellate court's reversal of the directed finding on count V. Indeck seeks cross-relief on counts I and IV. For the reasons that follow, we reverse the appellate court's judgment in part and affirm in part.

¶ 3                                    BACKGROUND

¶ 4 Indeck Energy Services, Inc., is a privately held developer, owner, and operator of independent power generation projects. The company develops, owns, and operates both conventional and alternative fuel power plants. Gerald Forsythe is Indeck's owner and Lawrence Lagowski its president.

¶ 5 Defendant, Christopher M. DePodesta, was vice president of business development for Indeck and, thus, an officer of the company from November 2010 until his resignation on November 1, 2013. In this position, DePodesta had overall responsibility for Indeck's electrical generation project development efforts. His duties included "supervising and assembling the research regarding suitable areas and sites within those areas for development of power generation projects; supervising the due diligence concerning the same; investigating the feasibility of developing certain classes or types of projects; and acquiring the sites, permits, and ultimately implementing the same." DePodesta was also responsible for suggesting new business development ideas and opportunities to Lagowski, as well as suggesting potential new business partners. DePodesta had authority to sign documents and contracts on behalf of Indeck, approve expenditures, and make hiring decisions, all for matters under $10,000.

¶ 6 Defendant, Karl G. Dahlstrom, was director of business development for Indeck from 2011 until his resignation on November 4, 2013. Dahlstrom's duties were the same as DePodesta's. Additionally, his "job was to go find opportunities and bring

them back" to Indeck, including opportunities "about development of turbines, [and] potential partners."

¶ 7    DePodesta supervised Dahlstrom and Kelly Inns, an engineer. These three comprised Indeck's business development team. Both DePodesta and Dahlstrom signed confidentiality agreements upon their employment with Indeck.

¶ 8    Defendant Halyard Energy Ventures, LLC (HEV), was founded in late 2010 by Dahlstrom. HEV is a consulting, management, and administration firm that develops electrical power generation projects. DePodesta later became a member of HEV.

¶ 9    Merced Capital (Merced) is a privately held investment advisor that specializes in "alternative investment strategies." Merced Partners III, L.P. (Merced III), is an investment fund and an affiliate of Merced. Merced III, in turn, owns Carson Bay Energy Holdings IV, LLC (Carson Bay). Hendrick Vroege worked simultaneously for both Carson Bay and Merced. In 2013 and at the time of trial, Carson Bay owned two "grey market" GE simple cycle gas turbines.[1]

¶ 10   Merced III and HEV formed Merced Halyard Ventures, LLC (MHV), in November 2014 after defendants' resignations from Indeck, to develop, construct, and operate electrical power generation plants.

¶ 11   In 2011, Indeck's board of directors provisionally approved the development of natural gas power plant projects in a region of Texas known as the Electrical Reliability Council of Texas (ERCOT). Lagowski directed DePodesta and Dahlstrom to determine "whether or not it made sense to develop natural gas [projects] and, if so, where to go to develop." The two, along with Inns, prepared a "Natural Gas Development Plan" (Plan) recommending Indeck develop plants in ERCOT. Defendants identified a site for development in Wharton County, Texas. Additionally, they identified four other sites for development in ERCOT. On February 20, 2012, Lagowski advised the business development team they must speak with him before signing any contract on the Texas projects.

---

[1]Grey market turbines are not being sold by the manufacturer and have never been installed or operated.

¶ 12        In 2013, Indeck submitted initial screening studies to ERCOT for several potential sites to develop natural gas power generation projects. On March 5, 2013, Indeck and Carson Bay entered into a mutual confidentiality agreement (MCA),[2] which was signed by DePodesta on behalf of Indeck. The MCA set forth the parties' intentions in entering into it: "The Parties wish to enter into discussions regarding the development by Indeck of simple cycle gas turbine projects in the Electric Reliability Council of Texas and an opportunity to be presented by the Company [Carson Bay] to Indeck." The MCA precluded the parties from soliciting or hiring each other's employees. On March 7, Dahlstrom sent an e-mail to Daniel Barpal, manager of Carson Bay, copying in DePodesta, stating "Dan, the [MCA] has been executed! Let's build some power plants together." It was Barpal's understanding that Indeck was looking to purchase the turbines. However, at trial, he testified Indeck was only 1 of 100 leads for their sale. Based on this e-mail, a conference call was held the next day between DePodesta, Dahlstrom, Barpal, Vroege, and another Merced employee, Eric Werwie.

¶ 13        In the beginning of March 2013, Lagowski, DePodesta, Dahlstrom, and William Garth, Indeck's director of finance, all understood they would attend the Platts Conference in Las Vegas, Nevada, starting April 8. DePodesta represented to Lagowski that he and Dahlstrom would make initial contacts on behalf of Indeck in contacting suppliers of financial products, potential development partners or project buyers, private equity firms, and grey market turbine providers at the conference. Carson Bay was identified as one of the private equity firms and a grey market turbine opportunity provider. One day after confirming their presence at the conference in Las Vegas with Lagowski, DePodesta and Dahlstrom scheduled a meeting with Vroege, Werwie, and Barpal in Houston for April 9, 2013. They did not advise Lagowski of this change in plans or their scheduled meeting.

¶ 14        On March 28, Lagowski e-mailed the development team advising them that Forsythe and the Indeck board of directors had approved going ahead with the Wharton site as a "proof of concept."

---

[2]Indeck developed the MCA and entered into it with third parties to protect its confidential and proprietary information. The form was "locked" so that no one could make substantive changes to it without Indeck's knowledge.

¶ 15     On April 9, DePodesta and Dahlstrom attended the dinner in Houston with Vroege, Barpal, and Werwie. According to Vroege, DePodesta and Dahlstrom told him that Indeck wanted a "free option" on the turbines Carson Bay sought to sell. According to Lagowski's testimony, neither were authorized to state this demand. Lagowski further testified (credibly, according to the circuit court's findings) that Indeck was not looking for a free option, which was an unreasonable position, and he could not think of a quicker way to kill a deal. Vroege, either at the Houston meeting or shortly thereafter, advised DePodesta and Dahlstrom that Merced was interested in contributing the turbines, then worth approximately $60 million, as equity in an Indeck project, in lieu of selling them. Lagowski testified that DePodesta did not advise him of this interest. Instead, DePodesta told Lagowski that Carson Bay would agree to take its turbines off the market for 30 to 60 days for use in an Indeck project if Indeck made a substantial, 10-15% nonrefundable down payment.[3] Lagowski testified this option did not make sense because Indeck did not know whether it had a viable project yet and, at this time, Indeck was not in a position to purchase the turbines. At some point, DePodesta advised Carson Bay that Indeck could not "swing" the down payment. On April 16, Dahlstrom e-mailed Barpal, Vroege, Werwie, DePodesta, and Garth, stating Indeck was not able to move forward with the opportunity. Rather, Indeck was looking for a free option to acquire the turbines at a given price during a given time period.

¶ 16     On June 13, 2013, DePodesta, Dahlstrom, and Inns traveled to Texas for meetings to kick off the Wharton project the following day. On this same day, DePodesta e-mailed Dahlstrom an outline of capital startup requirements to start their own company to develop natural gas power generation projects. The following morning, Dahlstrom told Inns she should look for a new job because "he did not think Indeck was committed to development."

¶ 17     On July 22, 2013, Dahlstrom sent an e-mail to Garth requesting "the most up to date pro forma"[4] for the Wharton project. Garth sent the requested document to

---

[3]There is evidence in the record that Carson Bay consistently required such a deposit.

[4]A *pro forma* is a financial model used to forecast project economics and measures potential returns for projects. It serves as a preliminary determination as to whether or not building the project would be successful. It includes land costs, construction costs, operating costs, and environmental costs as well as revenue projections. The *pro forma* for a project is updated as new information comes in.

Dahlstrom. Dahlstrom then e-mailed Vroege asking if he had time to "catch up regarding the GE equipment." The two spoke later that same day. The trial court found that Dahlstrom's ultimate goal in discussing the turbines was to gauge Carson Bay's interest in partnering with defendants, not Indeck, on the development of bigger power plants. On July 23, Dahlstrom sent an invitation requesting a meeting with Lagowski, Dahlstrom, and Garth for them to discuss "Texas Development Regarding Multiple Developments," and one of the items for discussion was "Path forward?" Later that day, Dahlstrom accessed business development data from Indeck's computer for the Wharton project and sent an e-mail to DePodesta attaching a copy of a capital requirements spreadsheet. The trial court found they discussed information from Indeck in preparing their numbers for discussions with Vroege.

¶ 18 The next morning, DePodesta and Dahlstrom spoke to Vroege and asked him if he "had interest in developing and funding a greenfield development company to develop power plants in Texas." It was Dahlstrom's understanding that Vroege did have such an interest and wanted to hear more about the opportunity to develop and fund greenfield plants in Texas. During this meeting, the three agreed to meet in Minnesota in August, at which time DePodesta and Dahlstrom would present what they described as "our ERCOT development plan." After this call, Dahlstrom accessed Indeck's computer to edit a nondisclosure agreement they intended to send to Vroege on behalf of HEV.

¶ 19 DePodesta testified that the purpose of the July 24 meeting with Lagowski and Garth was to "give this one big push to how Indeck used to do things," *i.e.*, having several developments going at one time. However, DePodesta did not ask Indeck whether it would be open to working with Carson Bay and Vroege and, in fact, did not even mention Carson Bay or the turbines. According to his testimony, at the meeting, they "were talking through trying to keep multiple developments going" and that he "understood that the cost of the development is something that would be an issue at Indeck." He admitted he did not mention that he had discussed with Vroege that morning Vroege's apparent interest in funding multimillion dollar developments for a greenfield development company, the "possibility of developing projects with Carson Bay or EBF [Merced] or any of its affiliates," or the fact Carson Bay could contribute its turbines. DePodesta and Dahlstrom indicated that, at this meeting, Indeck confirmed it would adhere to its strategy of

"proof of concept" and proceed first to develop the Wharton project before other developments in ERCOT it had identified.

¶ 20    Following this meeting, Dahlstrom e-mailed Vroege (now using his HEV e-mail account), copying in DePodesta on his HEV e-mail account, stating, "[t]hank you for taking the time to talk with us this morning. We enjoyed working with you and EBF to date and look forward to the opportunity to present our ERCOT development plan. Attached you will find our standard MNDA [(mutual nondisclosure agreement)]." This agreement stated it was between EBF and HEV and provided spaces for DePodesta and Dahlstrom to sign as managing partners of HEV. The agreement was dated and executed July 29, 2013, and recited that "[t]he Parties desire to exchange certain proprietary and commercially sensitive information in connection with a possible business relationship relating to the development of a portfolio of power plants in the ERCOT region."

¶ 21    Between July 24 and August 5, Dahlstrom put together the "Halyard Energy Power Development Strategy" and admitted he started with Indeck's Plan and made revisions to that before it became their document. Dahlstrom also admitted he used Indeck's time, equipment, materials, and facilities to put his plan together.

¶ 22    On August 6, 2013, DePodesta and Dahlstrom traveled to Minnesota to present their "Halyard Energy LLC ERCOT Power Development Strategy" to Vroege and Werwie.[5] The next day, Dahlstrom e-mailed Vroege and Werwie, stating "we feel as though EBF is the perfect strategic fit for what we are trying to accomplish" and that they "would like to move forward in discussions regarding a potential partnership" and that "the next step would be for EBF to draft a proposed letter agreement."

¶ 23    On August 19, Merced III drafted a letter of intent (LOI), which DePodesta suggested changes to. During the next few weeks and months, defendants used their Indeck business days and its equipment to negotiate the terms of the LOI and create HEV documents. Both used measures to wipe these documents and information from their computers to prevent discovery of what they were doing.

---

[5]The trial court found Dahlstrom had copied various of Indeck's files or folders from his computer and used them and other Indeck documents to create documents they submitted to EBF.

¶ 24    On August 28, Vroege, Werwie, DePodesta, and Dahlstrom presented their proposed venture plan to Merced's investment committee, noting the "focal point" of the venture was to place Carson Bay's two turbines in the best development site and move for development as quickly as possible. They stated the "central premise is to create a real option to build a simple-cycle peaking[6] plant within one year by permitting a site and having the equipment on the shelf," which "creates a place to put the equipment." The investment memo indicated defendants would be leaving Indeck and working exclusively for them managing the daily operations.

¶ 25    On August 30, DePodesta, Dahlstrom, and HEV executed the LOI with Merced III to form a limited liability company to develop three natural-gas-fired, simple cycle power plants in Texas. Merced III agreed in this document to make available or contribute Carson Bay's two turbines for specific projects. The document further provided that defendants and HEV would deal exclusively with Merced III for the next 30 days to negotiate an LLC agreement and management agreement and that defendants were not to inform Indeck about the LOI or their negotiations. Defendants further agreed to keep this information confidential for one year following the termination of the LOI in the event it was terminated prior to financial closing. Thus, defendants could not inform Indeck even if their deal failed and they remained employed with Indeck. Thereafter, the parties began negotiating the terms of a limited liability agreement of MHV, *i.e.*, the agreement for HEV and Merced to work together.

¶ 26    During the week of October 7, 2013, acting as Indeck's director of business development, Dahlstrom attended confidential meetings with investment bankers in New York City with Lagowski and Indeck's director of finance regarding the Wharton project. According to Lagowski, one bank was enthusiastic and offered a "particular opportunity" to finance Indeck's Wharton project because Indeck's capital cost was very low compared to other transactions in the mergers and acquisitions sector. At the end of that week, Dahlstrom e-mailed Vroege and confirmed that he and DePodesta intended to move forward very soon and that he

[6]A peaking plant is one that starts up to provide electricity during periods of high demand, rather than being in constant operation.

had just finished four days of meetings with investment bankers discussing financing options in the energy market.

¶ 27    On October 15, 2013, Dahlstrom copied and removed from Indeck's premises thousands of documents and files, including business development documents related to the Wharton project. DePodesta also copied thousands of documents and files from Indeck's computers. On October 30, DePodesta received a draft LLC agreement, which the trial court found contained identical terms as the agreement ultimately signed by defendants.

¶ 28    DePodesta resigned from Indeck on November 1, 2013, and Dahlstrom on November 4. Both admitted they did not tell anyone at Indeck that they had signed the LOI with Merced III, that they intended to pursue an opportunity with a new LLC, that they intended to set up a new LLC with affiliates of EBF, or that they were going to be involved in developing peaking plants in ERCOT.

¶ 29    On November 6, 2013, the MHV LLC agreement and management agreement were signed. Under the LLC agreement, HEV would receive a 20% profit interest in MHV after Merced III had recouped all initial investments plus a 10% preferred annual rate of return. HEV would be a member of MHV but would have no voting interest. The agreement did not preclude Merced from investing in other development companies. The agreement further provided that HEV would be responsible for, and manage, the day-to-day operation of MHV's business pursuant to the management agreement. Under the management agreement, HEV would work exclusively on behalf of MHV to provide consulting and management services to develop portfolios of projects, and each would receive $1.25 million.

¶ 30    By the time of trial, with the financial backing of Merced and Merced III, HEV had developed plans for two fully permitted, construction-ready peaking plant projects in Texas, the Halyard Wharton Energy Center and Halyard Henderson Energy Center. In January 2018, HEV, as operating partner of MHV, issued a confidential information memorandum (CIM) to a limited number of qualified parties interested in pursuing acquisition of up to 100% of MHV's direct equity interest in Halyard Wharton Energy Center. HEV's CIM represented that, following funding of the project, it "will enter into a Gas Turbine Generator Purchase and Sale Agreement with Carson Bay," for the purchase of two GE

7FA.03 model turbines. At the time of trial, this agreement had not been signed, and bids for the project had been postponed.

¶ 31    In March 2014, Indeck filed a four-count complaint against defendants. Count I, titled "Breach of Confidentiality Agreement," sought an injunction to enforce the agreement and enjoin defendants from using and disclosing Indeck's confidential, proprietary, and trade secrets information. Counts II and III are not at issue before this court. In count IV, titled, "Disgorgement," Indeck alleged that DePodesta owed Indeck high fiduciary duties based on his position as an officer and vice president. Indeck similarly alleged that Dahlstrom owed it high fiduciary duties based on his position of trust with Indeck. Indeck alleged defendants breached their duties by

> "competing with Indeck Energy as Halyard Energy while they were employed by Indeck Energy; by disclosing Indeck Energy's confidential, proprietary and trade secret [i]nformation as the development plans and strategies of Halyard Energy; by soliciting investors in or financing for Halyard Energy using Indeck Energy's confidential, proprietary and trade secret [i]nformation; and by entering into agreements with such investors and/or financing sources."

Indeck sought disgorgement of "any and all compensation, bonuses and other benefits they received from Indeck Energy while they were employed by and in breach of their fiduciary duties to Indeck Energy," as well as "any and all benefits they have received or will receive from their wrongdoing after their employment with Indeck Energy, including any financing they have obtained and any rights they have obtained in developments or entities that seek to develop independent power generating projects."

¶ 32    After learning defendants had signed the LLC agreement, Indeck amended its complaint and added count V, titled "Usurpation of Corporate Opportunity." Indeck alleged DePodesta and Dahlstrom had a duty to "fully and fairly present opportunities to the company's President and senior management that were in its line of business so that informed decisions could be made whether to pursue these opportunities." DePodesta was also required to "present all material facts and circumstances regarding these opportunities" including "disclosing all material facts involving opportunities to obtain or acquire turbines that could be used in the development of Indeck Energy's proposed projects." According to the complaint, in early 2013, defendants became aware of opportunities Indeck could pursue with

Carson Bay, Merced/EBF, and Merced III, which it referred to as the "Carson Bay-Merced Opportunities" or "Opportunities." The complaint alleged that these "Opportunities" "contemplated establishing a continuing relationship between Indeck Energy and Carson Bay, its affiliates and its representatives to develop several simple cycle gas turbine projects in the ERCOT area of Texas. These opportunities also included an 'opportunity' that Carson Bay would present to Indeck Energy." In connection with the "Opportunities," the complaint alleged that Indeck and Carson Bay entered into an MCA on March 5, 2013, which provided: "The Parties wish to enter into discussions regarding the development by Indeck [Energy] of simple cycle gas turbine projects in the Electrical Reliability Council of Texas and an opportunity to be presented by the Company to Indeck." The "opportunity" to be presented by Carson Bay "involved two GE turbines that Carson Bay had obtained and held for some time" and, in particular, that "Carson Bay offered the opportunity to Dahlstrom and DePodesta for Indeck Energy, but which Dahlstrom and DePodesta did not share with Indeck Energy to contribute the turbines in exchange for equity in one of Indeck Energy's projects in Texas." The complaint then alleged that on April 1, 2013, defendants "decided to usurp the opportunities that belonged to Indeck Energy to develop projects with Carson Bay and its affiliates, and to further usurp the opportunity Carson Bay presented to exchange its turbines in exchange for equity in an Indeck energy ERCOT project." The complaint then detailed the wrongful conduct and activities defendants engaged in over the next several months to usurp the "Opportunities" and asserted their "breaches of their fiduciary duties foreclosed and prevented them from exploiting the Carson Bay-Merced Capital Opportunities." The complaint alleged that defendants' breaches have "caused significant injury to Indeck Energy. The loss of $60 million in equity (from the exchange of turbines for equity) in the Indeck Wharton project creates significant risk and additional costs in financing the project—indeed, that additional risk heightens the chances that the entire Indeck Wharton project could fail." Additionally, the breaches "foreclosed potential future project opportunities that Indeck Energy could have developed with Merced Capital and Carson Bay," as well as "the ability to develop other projects in the ERCOT area with Merced Capital and/or its facilities." Indeck sought disgorgement of "any and all benefits, including increased compensation, profit interests, they have received or may receive from usurping the Carson Bay-Merced Capital

- 11 -

Opportunities" and "assignment of any and all direct or indirect interest, including profit participation, Defendants hold in the Merced Halyard projects."

¶ 33    Following Indeck's presentation of its case-in-chief, the trial court directed a finding in favor of defendants on count I. It concluded that (1) Indeck's confidentiality agreement was unenforceable because it was overbroad, (2) Indeck failed to prove it would be irreparably harmed, and (3) Indeck failed to prove it had sustained injury. As such, Indeck had failed to prove injunctive relief was available.

¶ 34    In addition, on March 21, 2017, the trial court directed a finding in favor of defendants on count V. In ruling on this count, the trial court noted it was undisputed the turbines were still on the market at the time of trial. It found there was no evidence Indeck had ever offered to buy the turbines or make a deposit to take them off the market. Thus, "Indeck has not seriously challenged Defendants' position that any turbine opportunity that existed in 2013 was not taken by the Defendants because it is still available today." Accordingly, "Plaintiff has not set forth a *prima facie* case for usurpation of any corporate opportunity involving the turbines." The trial court directed a finding on the "turbine opportunity" in favor of defendants. With respect to the "funding opportunities," the court found there was no evidence "Merced promised HEV an exclusive development agreement for projects in ERCOT or that Indeck made any attempt to partner with Merced after Defendants resigned." The court then found that "Defendants' argument that no funding opportunity was usurped and that any funding opportunity that Indeck might had [*sic*] in 2013 is still available to Indeck today is persuasive." As such, it directed a finding on the "funding opportunity" in favor of defendants.

¶ 35    Following the completion of the trial, on December 10, 2018, the trial court rendered judgment in favor of Indeck on count IV. The trial court found both defendants owed a duty of loyalty to Indeck during the period of their employment and that the evidence at trial established both violated their duty of loyalty as of March 13, 2013. The court found defendants breached their duty in the following ways. Defendants (1) set up a meeting with Vroege, which was designed to ensure Lagowski would not attend, (2) stated Indeck wanted a free option on the turbines without having authority to make such a representation and knowing it would discourage further discussions with Indeck, (3) discussed Merced's potential investment in HEV but never disclosed such discussion to Indeck, (4) contacted

- 12 -

Vroege from Indeck's offices on July 23, 2013, to tell him they were starting their own company, (5) contacted Vroege on July 24, using Indeck phones, to further discuss the possibility of Merced funding defendants' venture, (6) accessed Indeck's materials to prepare for an HEV meeting with Vroege, (7) prepared the HEV power development strategy using Indeck's form on Indeck's time and using Indeck's computers, (8) downloaded thousands of Indeck records intending to take those records to support their new venture, (9) attempted to destroy downloaded files and records of downloading activity, (10) traveled to Minnesota to present the HEV power development strategy to Merced during the work week while being paid by Indeck, (11) engaged in demonstrable business activity when they entered into an MCA with Merced, (12) negotiated a letter of intent on Indeck's time and using its equipment that required them not to disclose their negotiations to Indeck even though their jobs required them to bring development opportunities to Indeck's attention, and (13) negotiated the MHV LLC agreement and management agreement while at Indeck using its equipment. The court also found that Dahlstrom encouraged Kelly Inns to look for a new job at the time they were preparing to leave, knowing that if all three left there would be greater damage to Indeck.

¶ 36    The trial court granted Indeck's request to disgorge defendants' salaries from March 13, 2013, until their resignations. The court denied Indeck's request to disgorge any and all compensation they received from Merced via HEV. According to the court, Indeck argued essentially that defendants must disgorge anything they received "in perpetuity" as a result of the violation of their fiduciary duties. The court disagreed. The court noted, first, "the argument that every penny Defendants received from Merced/HEV was due to their disloyalty to Indeck is speculative at best. It was certainly not proven at trial." Second, defendants' breaches ended when they resigned. In this regard, the court stated,

"Indeck has not brought a case to the Court's attention that holds that after a breach of fiduciary duty has ended, a Plaintiff is entitled to compel a Defendant to disgorge any future salary earned from a subsequent employer as a result of the fact that the Defendant negotiated with the subsequent employer during a period of disloyalty."

Thus, the trial court denied this claim. The court also denied Indeck's request to impose a constructive trust on potential future benefits. The court agreed with

defendants that it cannot disgorge a "hypothetical future benefit." In this respect, the court noted that ERCOT is a "volatile and speculative market" and that no one knows whether defendants will obtain any future benefits. Thus, any damages are purely speculative and uncertain. Additionally, the court pointed out that "a hypothetical future benefit is not an identifiable fund traceable to a breach such that it can become the res of a proposed trust." Accordingly, the court denied this claim.

¶ 37    Indeck appealed. The appellate court affirmed the trial court's judgment on count I, agreeing with defendants that it need not review the enforceability of the confidentiality agreement because such a disposition was not essential and would not affect the trial court's decision to decline to enter an injunction. 2019 IL App (2d) 190043, ¶ 87. The court pointed out that Indeck had not challenged the trial court's ruling that it failed to prove it would be irreparably harmed and failed to prove it sustained injury. Thus, such arguments were forfeited, and "regardless of whether the Confidentiality Agreement is enforceable, the trial court's directed finding in defendants' favor stands on these other grounds." *Id.* ¶ 89.

¶ 38    The appellate court also affirmed the trial court's judgment on count IV and rejected Indeck's argument that the trial court erred in denying disgorgement of the management fees as well as erred in declining to order a constructive trust over defendants' 20% profit interest. *Id.* ¶ 73. With respect to the management fees, the appellate court held that the trial court reasonably found defendants' breaches ended when they resigned and reasonably found speculative Indeck's argument that all money defendants received from Merced/HEV was due to their disloyalty. Specifically, the appellate court determined that all the acts the trial court set forth occurred during defendants' employment and none continued after their resignation. *Id.* ¶ 80. With respect to a constructive trust, the appellate court pointed out that the trial court found profits were purely speculative and hypothetical. Additionally, it noted that Indeck's own expert testified he could not opine, to a reasonable degree of certainty, what profits defendants would receive. The appellate court agreed the evidence showed development in ERCOT was speculative and uncertain in many respects and concluded, "[g]iven this evidence, the speculative nature of any profits from MHV formed a reasonable basis for the trial court's order declining to impose a constructive trust on those profits." *Id.* ¶ 85.

¶ 39    The appellate court reversed the circuit court on count V, concluding that the trial court erred in determining plaintiff had not presented sufficient evidence to show usurpation. *Id.* ¶ 56. In reviewing the usurpation claim, the court noted that a claim for usurpation was a " 'subspecies of the fiduciary duty of loyalty.' " *Id.* ¶ 60 (quoting Eric Tally, *Turning Servile Opportunities to Gold: A Strategic Analysis of the Corporate Opportunities Doctrine*, 108 Yale L.J. 277, 279 (Nov. 1998)). The court then addressed whether a corporate opportunity existed and whether there was a misappropriation of that opportunity. *Id.* ¶ 61. It noted the circuit court found plaintiff had not proven defendants could be liable on the two corporate opportunities. *Id.* ¶ 63. The appellate court noted, however, that only the funding opportunity was at issue on appeal. *Id.* ¶ 64. Plaintiff's position was that the evidence established defendants usurped the opportunity to partner with Merced and its affiliates to develop projects in ERCOT. *Id.* The appellate court concluded this was a corporate opportunity. *Id.* ¶ 65. It then found defendants usurped that opportunity. The appellate court noted that, in November 2013, defendants formed MHV to "*develop, construct, and operate electric-power-generation projects in ERCOT*, an activity identical to the ultimate goal of the Funding Opportunity." (Emphasis in original.) *Id.* ¶ 66. Defendants did not tender or disclose this to plaintiff nor seek consent. According to the appellate court, this "answer[ed] in the affirmative the corporate-usurpation question." *Id.*

¶ 40    The appellate court disagreed with defendants' argument that, when an opportunity is not exclusively bound to a particular partner, there has been no usurpation. *Id.* ¶ 68. The appellate court found the trial court erroneously focused on the fact the opportunity was still available. Instead, according to the appellate court, "The proper focus was whether the opportunity [defendants] took was within Indeck's line of business (it was) and whether it was disclosed, tendered, and consented to (it was not)." *Id.* ¶ 69.

¶ 41    The appellate court stated this case presents unusual facts and acknowledged usurpation cases typically involve an opportunity that is available to one party or the other, but not both. *Id.* ¶ 70. Nonetheless, the court concluded:

"the facts here lead to a clear conclusion that Indeck presented sufficient evidence in its case-in-chief that [defendants] breached their duties to Indeck. Because there is sufficient evidence that defendants usurped a corporation

opportunity, we find, under these facts, that it is immaterial whether additional opportunities were (or still are) available for Indeck to partner with Merced or its affiliates. To hold otherwise would *not* be consistent with the prophylactic purpose of the fiduciary rules to allow [defendants] to exploit an opportunity (even if it is one of many) consistent with Indeck's business, without first disclosing and tendering the opportunity to Indeck and obtaining its consent." (Emphasis in original.) *Id.*

¶ 42     We granted DePodesta and Dahlstrom's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). Indeck requests cross-relief, asking this court to disgorge defendants' management fees and impose a constructive trust on their profit interest as well as to address the validity of the confidentiality agreement.

¶ 43                                    ANALYSIS

¶ 44               I. Count V, Usurpation of Corporate Opportunity

¶ 45     In count V of its complaint, plaintiff alleged that defendants usurped for their own advantage the corporate opportunity "to develop several simple cycle gas turbines in the ERCOT area of Texas" with Merced and Carson Bay. In addressing this allegation, the trial court divided the corporate opportunity into two components—the "turbine opportunity," which refers specifically to the development of two peaking power plants in the ERCOT area using the two grey market, simple cycle gas turbines owned by Carson Bay, and the "funding opportunity," which refers more generally to the ability to develop other projects in the ERCOT area with Merced. The trial court directed a finding in favor of defendants on count V following plaintiff's case-in-chief. The trial court found that, although defendants had breached their fiduciary duties to plaintiff, plaintiff had failed to establish any usurpation of a corporate opportunity because both the turbine opportunity and the funding opportunity were still available to plaintiff at the time of trial.

¶ 46     The appellate court reversed the trial court's ruling, holding that it was "immaterial" whether a corporate opportunity still existed for plaintiff. 2019 IL App (2d) 190043, ¶ 70. According to the appellate court, once plaintiff established that DePodesta and Dahlstrom had breached their fiduciary duties by failing to

- 16 -

disclose or tender the funding opportunity to plaintiff, that "answer[ed] in the affirmative the corporate-usurpation question." *Id.* ¶ 66. In other words, the appellate court concluded that plaintiff could establish a claim for usurpation of a corporate opportunity merely by showing that defendants had breached their fiduciary duties. We disagree.

¶ 47 To prevail on a claim for breach of fiduciary duty, it must be alleged and ultimately proved (1) that a fiduciary duty exists, (2) that the fiduciary duty was breached, and (3) that such breach proximately caused the injury of which the party complains. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69; *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000). In a claim for usurpation of a corporate opportunity, the injury of which the plaintiff complains is the taking or seizing of a corporate opportunity by its fiduciary. See, *e.g.*, *Mullaney, Wells & Co. v. Savage*, 78 Ill. 2d 534, 545-46 (1980) ("it is a breach of fiduciary obligation for a person to seize for his own advantage a business opportunity which rightfully belongs to the corporation"); *Lindenhurst Drugs, Inc. v. Becker*, 154 Ill. App. 3d 61, 67 (1987) (the corporate opportunity doctrine prohibits a fiduciary of a corporation from misappropriating corporate property and from usurping business opportunities that belong to the corporation). Usurpation of a corporate opportunity is a distinct cause of action for breach of fiduciary duty that involves a particular type of injury: the taking or seizing of a corporate opportunity and the commensurate loss of that opportunity by the corporation. A corporate opportunity, in turn, is a proposed business activity that is " 'reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage.' " *Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126, ¶ 35 (quoting *Dremco, Inc. v. South Chapel Hill Gardens, Inc.*, 274 Ill. App. 3d 534, 538 (1995)); *Kerrigan v. Unity Savings Ass'n*, 58 Ill. 2d 20, 28 (1974). The "basic question" in all corporate opportunity cases is whether the fiduciary "has appropriated something for himself that, in all fairness, should belong to the corporation." *In re Trim-Lean Meat Products, Inc.*, 4 B.R. 243, 247 (Bankr. D. Del. 1980); see William Lynch Schaller, *Corporate Opportunities and Corporate Competition in Illinois: A Comparative Discussion of Fiduciary Duties*, 46 J. Marshall L. Rev. 1, 18 (2012) ("Strictly speaking, corporate opportunity cases are characterized by a particular and narrow fact pattern: (1) a third party presents an identifiable, concrete deal relating to the corporate employer's business ***; (2) the deal is a 'zero-sum' game in the sense that only the corporate employer or its

fiduciary—but not both—can seize it, leaving the loser permanently shut out; and (3) the fiduciary diverts the deal to himself, whether before or after his resignation.").

¶ 48    In this case, plaintiff failed to establish that defendants wrongfully appropriated either the turbine opportunity or the funding opportunity. With respect to the turbine opportunity, although defendants did develop plans to build two peaking power plants in the ERCOT area with Merced (the Halyard Wharton Energy Center and the Halyard Henderson Energy Center), as of the time of trial, those plans had failed. Defendants' unsuccessful attempt to build the plants does not give rise to a claim of misappropriation of corporate opportunity. *McGowan v. Ferro*, 859 A.2d 1012, 1038 (Del. Ch. 2004); *Carlson v. Hallinan*, 925 A.2d 506, 520 (Del. Ch. 2006) (opinion clarified in *Carlson v. Hallinan*, No. CIV.A. 19808, 2006 WL 1510759 (Del. Ch. May 22, 2006)). Had defendants succeeded in their efforts, we would of course be presented with a different case. However, because defendants' plans did not come to fruition, there were no wrongful gains made by defendants and no wrongful appropriation.

¶ 49    The funding opportunity referenced by the trial court stems from allegations in plaintiff's complaint that defendants' actions "foreclosed potential future project opportunities that Indeck could have developed with Merced Capital and Carson Bay," as well as "the ability to develop other projects in the ERCOT area with Merced Capital and/or its facilities." In other words, plaintiff alleged that defendants had appropriated for themselves the exclusive right to work with Merced on projects in the ERCOT area and, therefore, any further such opportunities were lost to plaintiff. The trial court expressly rejected this proposition as a factual matter, stating:

"With respect to the funding opportunities, there is no evidence that Merced promised [defendants] an exclusive development agreement for projects in ERCOT or that [plaintiff] made any attempt to partner with Merced after Defendants resigned from [plaintiff]. It appears that the Plaintiff may have assumed that there was only one partnership opportunity with Merced, but Plaintiff presented no evidence of that fact in its case in chief. Defendants' argument that no funding opportunity was usurped and that any funding

opportunity that Indeck might [have] had in 2013 is still available today is persuasive on this record."

We have carefully reviewed the record and find nothing to contradict the trial court's conclusion, which is not against the manifest weight of the evidence. We therefore agree with the trial court that defendants did not wrongfully appropriate for themselves the exclusive right to work with Merced on projects in the ERCOT area.

¶ 50    Apart from the turbine opportunity and the funding opportunity, plaintiff did not identify, or attempt to prove the existence of, any other corporate opportunity wrongfully appropriated by defendants. We conclude, therefore, that plaintiff failed to establish the injury necessary to prevail in a corporate usurpation claim.

¶ 51    The appellate court reasoned that allowing plaintiff's claim for usurpation of a corporate opportunity to go forward—even in the absence of any evidence that defendants had taken or seized a corporate opportunity—was necessary to serve the prophylactic purposes of fiduciary rules. 2019 IL App (2d) 190043. The problem with this reasoning, however, is that it is contrary to the fundamental principle that a plaintiff must establish an injury to recover for a breach of fiduciary duty. *Lawlor*, 2012 IL 112530, ¶ 69; *Neade*, 193 Ill. 2d at 444. Indeed, the appellate court's rule would allow a plaintiff corporation to recover damages in a suit for usurpation of a corporate opportunity even if the corporation were able to use the opportunity itself, and even if there were no wrongful gains that could be recovered from the fiduciary. We can see no justification for this result.

¶ 52    Defendants breached their fiduciary duties during their employment with plaintiff, and as a result of those breaches, the trial court required the defendants to disgorge their salaries for most of 2013. However, plaintiff failed to prove the injury necessary for its claim of usurpation of a corporate opportunity, *i.e.*, that defendants wrongfully appropriated the opportunity "to develop several simple cycle gas turbines in the ERCOT area of Texas." Accordingly, we reverse the judgment of the appellate court and affirm that of the circuit court on count V.

¶ 53                              II. Count IV, "Disgorgement" Based on
                                       Breach of Fiduciary Duty

- 19 -

¶ 54 With respect to count IV, plaintiff contends the trial court erred in holding that defendants' fiduciary duties ended when they resigned from Indeck. According to plaintiff, the trial court's ruling conflicts with decisions that hold, as a matter of law, that the fiduciary duty of officers continues after resignation for transactions begun during the employment and founded upon information obtained from that employment. Plaintiff further maintains that the trial court's ruling provides incentive for officers to breach their duties and then leave their employment and benefit from their disloyalty. In connection with this issue, plaintiff contends the trial court erred in failing to order defendants to disgorge management fees and impose a constructive trust on defendants' profits.

¶ 55 Defendants, in contrast, contend the judgments of the lower courts should be affirmed. According to defendants, plaintiff's argument rests upon a faulty premise, *i.e.*, that the trial court ruled their fiduciary duties ended when they resigned. Defendants assert that the trial court did not so rule. Rather, the trial court ruled that defendants' "breaches" ended with their resignations. Additionally, according to defendants, the trial court never found they breached their duties in connection with the Merced transaction, and plaintiff never alleged or argued they did. Defendants also argue that the trial court's refusal to order disgorgement of the management fees and impose a constructive trust on the profits should be affirmed.

¶ 56 The question of whether a defendant breached his duty is a question of fact. *Thompson v. Gordon*, 241 Ill. 2d 428, 438-39 (2011); *Keywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 226 (2010). Similarly, the question of when, and if, a breach ended is likewise a question of fact. We will not disturb the trial court's ruling on a question of fact unless it is against the manifest weight of the evidence. *Veco Corp.*, 243 Ill. App. 3d at 160. A ruling is against the manifest weight of the evidence only if an opposite conclusion is clearly evident.

¶ 57 We are mindful of the relevant count at issue. The claim under count IV is for disgorgement and a constructive trust based on breach of fiduciary duties alone. There are no allegations of usurpation of corporate opportunity or reliance on events or conduct subsequent to defendants' resignations. Plaintiff did not amend count IV when it later added count V and included allegations of post-resignation activities. Under count IV, the trial court expressly found that defendants' breaches ended upon their resignations from Indeck. This is a factual determination entitled

to due deference, and we cannot say it is against the manifest weight of the evidence.

¶ 58    Moreover, the appropriate remedy for a breach of fiduciary duty lies within the equitable discretion of the court. *Tully v. McLean*, 409 Ill. App. 3d 659, 681 (2011). The purpose of disgorgement is to deprive the wrongdoer of the gains from the breach. *Id.*; see also Deborah A. DeMott, *Causation in the Fiduciary Realm*, 91 B.U. L. Rev. 851, 852, 857 (2011) (disgorgement is an appropriate remedy to deprive the fiduciary of the benefit obtained through the breach; liability does not attach to assets acquired in a manner unrelated to the breach); Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011) (a third party must account to the beneficiary of the duty for benefits the third party obtains "in consequences" of the fiduciary's breach).

¶ 59    As the trial court noted, plaintiff offered no caselaw establishing that disgorgement is available after a breach of fiduciary duty has ended. If the breach ended, which the trial court so found, defendants' management fees and profits would not be tied to that breach. As such, they were not gains from their wrongdoing and, therefore, not recoverable under disgorgement principles.

¶ 60    "A constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct." *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill. 2d 278, 293 (1986). The proceeds of the alleged wrongful conduct must exist as an identifiable fund traceable to that conduct, such that it can become the *res* of the proposed trust. *People ex rel. Nelson v. Bates,* 351 Ill. 439, 443 (1933); *Moore v. Taylor*, 251 Ill. 468, 472-73 (1911); see also *Eychaner v. Gross*, 202 Ill. 2d 228, 274 (2002); John J. Dvorske & Michael Rosenhouse, Illinois Law & Practice *Trusts* § 55 (Jan. 2021 update) (essential elements of a *constructive trust* are the existence of identifiable property to serve as a *res* upon which a trust can be imposed and possession of that *res* or its product by a person who is to be charged as the constructive trustee (citing *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498 (1986))); 90 C.J.S. *Trusts* § 176 (Mar. 2021 update) ("Definitive, designated property, wrongfully withheld from another, is the very heart and soul of the constructive trust theory. Thus, it is necessary that there be a res or specific fund on which the trust may be fixed.").

- 21 -

¶ 61    The trial court found that profits were speculative and that there was no identifiable fund traceable to the breaches of fiduciary duties and, therefore, a constructive trust was not available. We agree. There is no identifiable property or fund to serve as the *res* upon which a constructive trust can be imposed. Nor did defendants possess any profits at the time of trial. Thus, the elements necessary to impose a constructive trust have not been established.

¶ 62    Accordingly, the trial court's decision to deny disgorgement of the management fees and refusal to impose a constructive trust on any profits was within its equitable discretion. We agree with the appellate court that the factors present formed a reasonable basis for the trial court's decision. For these reasons, we affirm the appellate court's decision on this count.

¶ 63                    III. Count I, Confidentiality Agreement

¶ 64    In count I, plaintiff sought permanent injunctive relief for breach of the confidentiality agreement. To be entitled to a permanent injunction, a party " 'must demonstrate (1) a clear and ascertainable right in need of protection, (2) that he or she will suffer irreparable harm if the injunction is not granted, and (3) that no adequate remedy at law exists.' " V*aughn v. City of Carbondale*, 2016 IL 119181, ¶ 44 (quoting *Swigert v. Gillespie,* 2012 IL App (4th) 120043, ¶ 27). The decision to grant or deny injunctive relief rests within the sound discretion of the trial court, and on review we will not disturb that decision absent an abuse of discretion. *Desnick v. Department of Professional Regulation,* 171 Ill. 2d 510, 516 (1996).

¶ 65    The trial court directed a finding in favor of defendants following plaintiff's case-in-chief, concluding Indeck's confidentiality agreement was unenforceable because it was overbroad. The trial court separately concluded, however, that injunctive relief was not available to plaintiff because (1) Indeck failed to prove it would be irreparably harmed and (2) Indeck failed to prove it had sustained injury based on any breach. The appellate court affirmed, agreeing with defendants that it need not review the enforceability of the Confidentiality Agreement because such a disposition was not essential and would not affect the trial court's decision to decline to enter injunctive relief. Because plaintiff failed to challenge the trial court's finding regarding its failure to prove the elements necessary for injunctive relief on review, the appellate court found such arguments forfeited and that the

- 22 -

trial court's directed finding stood on this ground, irrespective of whether the confidentiality agreement was enforceable.

¶ 66    Plaintiff argues the appellate court erred in declining to address whether its confidentiality agreement was enforceable. In support, plaintiff maintains review of the issue is properly before this court pursuant to *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 8 (1997). According to plaintiff, this court held in *Berlin* that, "even though an order would not affect the judgment below, '[t]here is life in the appeal because our decision could have a direct impact on the rights and duties of the parties.' " See *id.* at 6-7. Additionally, plaintiff asserts that *Berlin* stands for the proposition that, where a decision will have "important consequences" for the parties involved, it is proper to entertain the appeal. Specifically, according to plaintiff, review of the enforceability of a restrictive covenant was appropriate because "[a] determination in this case [adverse to the defendant] could mean that the [employer] must implement significant changes in its working relationships with its medical staff." See *id.* at 8; see also *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 63 (2006) (where a decision " ' "could have a direct impact on the rights and duties of the parties" there is life in the appeal' " (quoting *Berlin*, 179 Ill. 2d at 8, quoting *People ex rel. Bernardi v. City of Highland Park*, 121 Ill. 2d 1, 6-7 (1988)); *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 267, 287 (1992) (where a decision could have "important consequences" for the parties before the court, it is proper to entertain the appeal). Plaintiff maintains that a determination on the enforceability of the Confidentiality Agreement here falls within this settled authority. In addition, plaintiff maintains that, if the trial court's decision is not reversed, it "would require Indeck to 'implement significant changes' " in its working relationship with its staff and, thus, a determination on this issue "could have a direct impact on the rights and duties of the parties." Plaintiff also argues that defendants may have further liability under the agreement if it is found enforceable; thus, there is still "life in the appeal" and the issue is not moot.

¶ 67    We disagree with plaintiff that the decisions cited by it control or apply here. The issue in those cases was mootness. There is no issue of mootness here. There is no occurrence of events since the filing of the appeal that make it impossible for this court to render effectual relief. *Berlin*, 179 Ill. 2d at 7. As such, the reasoning

expressed by this court in those cases for addressing the appeals simply does not apply.

¶ 68        Moreover, even if principles regarding mootness applied, any decision on the merits would necessarily constitute an advisory opinion since it would not result in appropriate relief to plaintiff. As noted by the appellate court, plaintiff did not and does not challenge the trial court's ruling that it failed to prove (1) it would be irreparably harmed if an injunction did not issue and (2) it was damaged by the breach. The failure to prove the necessary elements for injunctive relief is an independent basis for granting judgment in favor of defendants on count I. Since plaintiff has not challenged these conclusions, we cannot say the trial court's decision was an abuse of discretion. As such, irrespective of whether the confidentiality agreement is enforceable, the trial court's directed finding in favor of defendants was proper. Accordingly, the appellate court did not err in refusing to address this issue.

¶ 69        Based on the above, we affirm the appellate court's judgment, affirming the trial court's grant of a directed finding on count I of plaintiff's complaint.

¶ 70                                    CONCLUSION

¶ 71        We hold that a cause of action for usurpation of a corporate opportunity requires a plaintiff to establish that the opportunity has in fact been taken, *i.e.*, that the opportunity is no longer available to it. Because the funding opportunity was still available to plaintiff at the time of trial, there was no usurpation by defendants, and therefore, we reverse the judgment of the appellate court with respect to count V. We affirm the judgment of the appellate court in all other regards.

¶ 72        Appellate court judgment affirmed in part and reversed in part.

¶ 73        Circuit court judgment affirmed.

¶ 74        JUSTICE OVERSTREET, dissenting:

- 24 -

¶ 75    I respectfully dissent from the majority's conclusion that defendants did not usurp a corporate opportunity. The majority indicates that, in a claim for usurpation of a corporate opportunity, the injury is the taking or seizing of a corporate opportunity by its fiduciary. The core principle of the corporate opportunity doctrine prohibits a fiduciary from usurping business opportunities that belong to the corporation and from using corporate assets to develop those opportunities (see *Graham v. Mimms*, 111 Ill. App. 3d 751, 763 (1982)), which I conclude is precisely what occurred in this case. However, the majority determined that, here, there was no usurpation of a corporate opportunity and thus no injury to plaintiff because the funding opportunity still existed for plaintiff at the time of the trial. I do not agree that this is the end of the inquiry.

¶ 76    The appellate court in this case emphasized the general rule that, if a fiduciary wishes to take advantage of an opportunity that is in the corporation's line of business, the fiduciary must first disclose and tender the opportunity to the corporation, then obtain the corporation's consent before acting on his or her own behalf. 2019 IL App (2d) 190043, ¶ 60 (citing *Graham*, 111 Ill. App. 3d at 765, *Mullany, Wells & Co. v. Savage*, 78 Ill. 2d 534, 549 (1980), and *Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126, ¶¶ 40-42). Thus, there are two layers of protection afforded plaintiff under this doctrine: (1) tender/disclose the opportunity and (2) obtain consent—neither of which occurred here. I find this irreconcilable with the majority's conclusion.

¶ 77    The tender/disclose/consent requirements of the corporate opportunity doctrine are long-standing principles that should not be circumvented. The rule of law established by the majority will permit disingenuous fiduciaries to procure business opportunities for themselves and to bypass the tender/disclose/consent requirements of the corporate opportunity doctrine merely by providing in their contracts that the opportunity is not exclusively available to any party.

¶ 78    Here, defendants usurped the corporate opportunity while still in the plaintiff's employ. The opportunity presented to defendants in 2013 is not the same opportunity that was available to plaintiff at the time of trial. This is exemplified by the allegations in plaintiff's complaint, as observed by the majority, "that defendants' actions 'foreclosed *potential future project opportunities* that [plaintiff] could have developed with Merced Capital and Carson Bay,' as well as 'the ability

- 25 -

to develop other projects in the ERCOT area with Merced Capital and/or its facilities.' " (Emphasis added.) *Supra* ¶ 49. There were "potential future project opportunities" in 2013 that were never realized by plaintiff and did not exist at the time of trial.

¶ 79 Indeed, any funding opportunity still existing at the time of trial was not the same as the opportunity for plaintiff to initially establish the relationship and take advantage of any "potential future project opportunities" available in 2013. For example, in 2013, plaintiff could have contracted for exclusive rights, negotiated terms that favored it at that time, dealt exclusively with Merced III, negotiated the initial opportunity to receive profit interest in MHV after Merced III recouped initial investments, managed day-to-day operation of MHV's business, worked exclusively on behalf of MHV, and earned income between 2013 and the time of trial, none of which were realized due to defendants' failure to tender and disclose. The definition of "opportunity" is "a favorable juncture of circumstances" and "a good chance for advancement or progress." Merriam-Webster's Collegiate Dictionary 870 (11th ed. 2020). The opportunity available to plaintiff at the time of defendants' actions was lost to plaintiff, even though a funding opportunity later remained available to plaintiff pursuant to carefully crafted contract terms. In failing to tender or disclose or obtain consent for their activities, defendants usurped the opportunity presented at that time.

¶ 80 Ironically, in this case, defendants were specifically hired to scout for opportunities and present them to plaintiff. Accordingly, defendants' employment duties included, in part, what the corporate opportunity doctrine requires—to seek and procure business opportunities for plaintiff's benefit, which necessarily required tendering and disclosing the opportunities to plaintiff. Defendant Dahlstrom testified that the funding opportunity was a " 'proposed activity which [plaintiff] had the capacity to engage,' " thereby judicially admitting that developing such projects was incident to plaintiff's prospective or present business. 2019 IL App (2d) 190043, ¶ 30. Notwithstanding this knowledge, defendants proceeded to use plaintiff's time and equipment to procure the funding opportunity for themselves. *Id.* ¶ 31. Moreover, defendants conspired with Merced III to not disclose the negotiations to plaintiff (*id.*) and admitted that they did not disclose the opportunity to plaintiff at any time, before or after they resigned their employment with plaintiff (*id.* ¶ 64). Defendants took for themselves the funding opportunity as

it was presented in 2013. Because defendants never disclosed or tendered the opportunity to plaintiff, it follows that they did not obtain plaintiff's consent prior to pursuing the opportunity for themselves. Hence, all that was necessary to establish a claim for usurpation of a corporate opportunity transpired here. See *id.* ¶ 60; *Graham*, 111 Ill. App. 3d at 761, 763; *Mullany*, 78 Ill. 2d at 549; *Advantage Marketing Group*, 2019 IL App (1st) 181126, ¶¶ 40-42.

¶ 81 The majority decision permits defendants in this case to evade liability for usurping a corporate opportunity merely because the operating agreement allowed Merced III to partner with any entity. As it stands, the rule of law established by the majority will allow dishonest fiduciaries to procure opportunities for themselves and strategically contract their way out of the requirements of the corporate opportunity doctrine, thereby avoiding any consequences of usurping corporate opportunities.

¶ 82 As the appellate court pointed out, this case is unusual, as corporate opportunity cases typically involve an opportunity that is available to one party or the other, but not both. 2019 IL App (2d) 190043, ¶ 70. However, the appellate court concluded—and I agree—that, because there is sufficient evidence that defendants usurped a corporate opportunity, it is immaterial whether additional opportunities were or still are available to plaintiff. *Id.* I further agree that this conclusion is consistent with the prophylactic purpose of the fiduciary rules to forbid a defendant to exploit an opportunity—even if it is one of many—consistent with plaintiff's business, without first disclosing and tendering the opportunity to plaintiff and obtaining its consent. *Id.* (citing *Kerrigan v. Unity Savings Ass'n*, 58 Ill. 2d 20, 28 (1974)). The appellate court succinctly summarized its conclusion by stating: "The proper focus was whether the opportunity [defendants] took was within [plaintiff's] line of business (it was) and whether it was disclosed, tendered, and consented to (it was not)." *Id.* ¶ 69.

¶ 83 In sum, the majority indicates that, in a claim for usurpation of a corporate opportunity, the injury is the taking or seizing of a corporate opportunity by its fiduciary. However, the majority concludes that there was no usurpation of a corporate opportunity and no injury to plaintiff because the funding opportunity was available to plaintiff. Conversely, I would conclude that, under the corporate opportunity doctrine, the injury resulted not only from what was done, *i.e.*, the

taking of the opportunity, but also what was not done, *i.e.*, failing to tender/disclose and obtain consent. As observed, defendants usurped the corporate opportunity at the time of their actions and failed to tender/disclose the opportunity and obtain plaintiff's consent before doing so.

¶ 84       For these reasons, I respectfully dissent from the majority's conclusion on this issue and agree with the appellate court's conclusion that defendants usurped a corporate opportunity from plaintiff. Accordingly, I would affirm the entirety of the appellate court's decision.

¶ 85       JUSTICES GARMAN and CARTER join in this dissent.